07-1237-cv
Spinelli v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

(Argued: January 22, 2009          Decided: August 7, 2009)

Docket No. 07-1237-cv

------------------------------------------------------x

ANGELA SPINELLI and OLINVILLE ARMS, INC.,

Plaintiffs-Appellants,

-- v. --

CITY OF NEW YORK and PASQUALE CARABELLA, New York City Police Sergeant,

Defendants-Appellees.

------------------------------------------------------x

B e f o r e :  WALKER and CALABRESI, Circuit Judges.[*]

Appeal by Plaintiffs from a judgment entered in the United States District Court for the Southern District of New York (Richard C. Casey, Judge), granting Defendants' motion for summary judgment and dismissing Plaintiffs' due process, Fourth Amendment, and tortious interference with business relations claims. On appeal, we AFFIRM the district court's dismissal of Plaintiffs' Fourth Amendment claim. The district court's dismissal of the due process claim is REVERSED, and the case is

---

[*] The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 6, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. See 28 U.S.C. § 46(d); Local Rule 0.14(2); United States v. Desimone, 140 F.3d 457 (2d Cir. 1998).

REMANDED for the district court to enter summary judgment in favor of Plaintiffs and to calculate damages on that claim. The dismissal of the tortious interference claim is VACATED and REMANDED for further consideration.

SANFORD F. YOUNG, Law Offices of Sanford F. Young, (Laura Colatrella, on the brief), New York, N.Y., and David Zelman, Law Offices of David A. Zelman, Brooklyn, N.Y., for Plaintiffs-Appellants.

ANN E. SCHERZER, Assistant Corporation Counsel, (Kristin M. Helmers, Mark Muschenheim, Of Counsel), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y., for Defendants-Appellees.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiffs-Appellants Angela Spinelli and Olinville Arms, Inc. (collectively "Spinelli") appeal from a judgment of the district court (Richard C. Casey, Judge), granting summary judgment to Defendants-Appellees City of New York and New York City Police Sergeant Pasquale Carabella (collectively "the City") dismissing Plaintiffs' Fourth Amendment, due process, and tortious interference with business relations claims that were based on the City's confiscation of Spinelli's firearms inventory and suspension of her dealer's license. On appeal, Spinelli argues that the existence of material issues of fact on the Fourth Amendment and due process claims preclude summary

-2-

judgment, and that the district court should have exercised supplemental jurisdiction over her state-law tortious interference claim.

We conclude that the district court properly dismissed Spinelli's Fourth Amendment claim because the City's warrantless search of Olinville Arms was objectively reasonable and performed pursuant to established regulations. However, the City violated due process by denying Spinelli constitutionally sufficient notice and the opportunity for a post-deprivation hearing. Therefore, we reverse the grant of summary judgment in favor of the City on the due process claim, and remand to the district court to enter summary judgment in favor of Spinelli and determine damages on that claim. We also remand for further consideration of Plaintiffs' tortious interference claim.

**BACKGROUND**

Olinville Arms, Inc. ("Olinville") is a gun shop, shooting range, and travel agency located in Bronx County, New York, owned and operated by Angela Spinelli. Olinville's license was issued by the New York City Police Department ("NYPD") License Division (the "License Division" or the "Division"). The license is conditioned upon compliance with regulations under Title 38 of the Rules of the City of New York ("Rules") that require gun dealers to adhere to certain security restrictions and provide that the licensee's "premises and firearms[] shall be subject to

inspection at all times by members of the Police Department."
See 38 RCNY § 4-06(a)(3). If a gun dealer fails to comply with
the Rules, the Division may suspend or revoke the dealer's
license "for good cause by the issuance of a Notice of
Determination Letter to the licensee, which shall state in brief
the grounds for the suspension or revocation and notify the
licensee of the opportunity for a hearing." 38 RCNY § 4-04(*l*).

In the wake of the September 11, 2001 terrorist attacks, the
47th Precinct of the NYPD was tasked with providing "enhanced
security to sensitive locations within its boundaries," known as
"Omega posts" or "Omega watches." The Omega post program
extended through October 2001, and Olinville was an Omega post.

On October 8, 2001, Captain Charles McSherry, an officer
from the 47th Precinct, entered Olinville under the Omega post
program without a warrant or Spinelli's permission and searched
the premises. The search revealed the security at Olinville to
be "grossly inadequate." Security issues included an unwatched
counter area, a large hole in Olinville's backyard fence, and two
unlocked safes.

On October 9, 2001, the License Division advised Spinelli by
letter that, "as a result of failure to provide adequate security
for [Olinville]," her dealer's license was suspended. The letter
directed Spinelli to surrender all firearms "pending the
conclusion of the [License Division's] investigation," which

-4-

would determine whether Olinville's license would be "continued, suspended, or revoked."  The letter told Spinelli that Sergeant Michael Kaplon was assigned to her case and provided Kaplon's contact number, but did not notify Spinelli of the opportunity for a hearing, as required by the Rules.  See 38 RCNY § 1-04(f). Officers from the 47th Precinct seized approximately 300 weapons from Olinville, many of which, according to Spinelli, had already been sold to customers who later demanded a refund.

Spinelli hired attorney John Chambers, who had experience in gun licensing matters, to help retrieve her license and firearms. According to Chief Inspector Benjamin Petrofsky of the License Division, "[a dealer's] license [is] . . . normally suspended for the duration of the investigation.  That's the norm."  Instead of requesting a formal hearing, which Chambers believed could take months to years to decide, Chambers contacted members of the License Division on an informal basis "through negotiations and conversations" that included letters to the Division requesting the immediate return of Spinelli's property.[1]  Chambers also "was imminently prepared to file a lawsuit against the Police

---

[1]    In one letter to the Division, Chambers alleges that Sergeant Pasquale Carabella, a police officer in the 47th Precinct and an individual defendant named in the underlying action, "plan[ned] to go into business" selling firearms in the Bronx, and therefore, directed the suspension of Olinville's permit "to put his competition out of business."  This allegation, based on Chambers' "good and reliable authority," is not supported by any other evidence in the record.

-5-

Department" to retrieve Spinelli's property.

After retaining Chambers, Spinelli received a second letter from the License Division, dated October 19, 2001, that suspended Olinville's shooting range license pending investigation of the October 8 incident report. Chambers promptly met with the License Division, and argued that "there were no sufficient stay or security issues that [he] saw, vis-à-vis [the] gun range." One day later, the shooting range license was reinstated.

On November 7, 2001, Sergeant Kaplon re-inspected Olinville, but found that "there was nothing done to repair the deficiencies with the lack of security within the store." According to Kaplon, Olinville exhibited "total disregard for the rules and regulations of maintaining a Gun Dealer License." On the same day, Chambers sent a letter to the License Division, informing the Division of planned security improvements at Olinville. These improvements were tailored to remedy McSherry's specific complaints, and they included assurances by Spinelli that she would "restore the fences in the backyard area," install video surveillance in the store, renovate Olinville's counter area, and build a "large concrete room where her gun safes are housed."

On November 16, 2001, Chief Inspector Petrofsky recommended the reinstatement of Olinville's license. Petrofsky concluded that, "[c]onsidering Olinville has been in business for over 30 years," it was in the "best interests of fairness" to return

Spinelli's property immediately and allow her thirty days to make the required security improvements. On November 20, 2001, License Division Deputy Inspector Thomas Galati concurred in recommending the return of Olinville's license and firearms. On December 5, 2001, the Division sent Spinelli a letter advising her of the license reinstatement, thereby permitting her to reopen her gun shop. According to Spinelli, "Defendants' actions resulted in Plaintiffs' loss of approximately two months of sales and profits" that included the "unexplained" time lag between the recommendation of license reinstatement on November 20 and the official notice of reinstatement on December 5.

On November 8, 2002, Spinelli filed the instant suit against the City pursuant to 42 U.S.C. § 1983. Spinelli alleged that "Defendants' confiscation of Plaintiffs' licenses and weapons was illegal and violated Plaintiffs'" due process and Fourth Amendment rights. Specifically, Spinelli alleged that Defendants had violated due process by seizing Olinville's weapons and suspending its license without providing the "required notice or hearing," and the Fourth Amendment by performing a search of Olinville's premises "without probable cause or justification." Spinelli also claimed that "[b]y reason of their acts and omissions, Defendants . . . intentionally interfered with Plaintiffs' business relationships" in violation of New York state law.

After both parties moved for summary judgment, the district court granted the City's motion. First, the district court concluded that the City's search of Olinville's premises, seizure of the firearms, and suspension of Olinville's license were reasonable due to "the apparent security lapses at Olinville," and therefore did not violate the Fourth Amendment, which prohibits only "unreasonable . . . seizures."

With respect to Spinelli's due process claim, the district court, citing Sanitation & Recycling Industries v. City of New York, 107 F.3d 985, 995 (2d Cir. 1997), concluded that Spinelli did not have a protectable property interest in her gun dealer license. The district court further determined that, in any event, Spinelli had "received all the process that was due" through notice and "an opportunity to be heard," despite, as the court noted, the absence of a formal hearing and the failure of the City's letters to explain what rules and regulations Olinville had violated. Although the district court found that Spinelli had a protected property interest in the seized firearms, it concluded that, under the balancing test articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), there was no due process violation in light of the "opportunity to be heard" and exigent circumstances. Finally, having dismissed Spinelli's constitutional claims, the district court declined to exercise supplemental jurisdiction over Spinelli's tortious interference

-8-

state law claim.[2]

Spinelli appealed to this court.

**DISCUSSION**

**I.   Legal Standards**

On appeal, we review the district court's grant of summary judgment de novo. Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004). The district court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

This standard requires that courts "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted). Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." Id. at 252 (internal

---

[2]   The district court also rejected Spinelli's substantive due process claim to the extent that it was alleged in the complaint, a conclusion that Spinelli does not challenge on appeal.

citation omitted). Thus, a nonmoving party can defeat a summary judgment motion only "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100 (2d Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) and Fed. R. Civ. P. 56(c)).

**II.  The Fourth Amendment Claim**

First, Spinelli claims that the October 8 warrantless search of Olinville's premises by Captain McSherry violated the Fourth Amendment.[3]  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend IV.  "Our prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property."  United States v. Gordon, 655 F.2d 478, 483 (2d Cir. 1981) (internal quotation marks omitted). However, in the case of a "closely regulated industry," such as gun dealerships, "the traditional Fourth Amendment standard of reasonableness for a government search" lessens as "the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened

---

[3]     Spinelli does not argue that the seizure of her firearms or suspension of her dealer's license also violated the Fourth Amendment.  Accordingly, any such argument is waived on appeal. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).

. . . ." Palmieri v. Lynch, 392 F.3d 73, 80 (2d Cir. 2004) (quoting New York v. Burger, 482 U.S. 691, 702 (1987)).  Thus, "warrantless inspection[s] of commercial premises may well be reasonable within the meaning of the Fourth Amendment." Id.  The baseline test for all Fourth Amendment claims "is one of 'objective reasonableness.'" Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005) (quoting Graham v. Connor, 490 U.S. 386, 399 (1989)).

Here, Spinelli alleges that the October 8 search of Olinville's premises was "objective[ly] [un]reasonable[]," and thus violated the Fourth Amendment.  Spinelli says that the search was unreasonable because Officer McSherry only conducted it in order to "find an excuse to shut down [Olinville] so as to reduce the Precinct's staffing burdens imposed by the month-long, citywide 'Omega Watch' program," and because Officer Carabella, who planned to open his own gun shop, wanted to eliminate the competition.  Even if we were to assume such a malicious motivation (for which there is no record support), it would be of no moment.  The relevant inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see Bryant, 404 F.3d at 136 (extending Graham, an excessive force case, to pretrial detentions following warrantless arrests);

-11-

Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001) (same, as to warrantless searches).  "[T]he subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment."  Graham, 490 U.S. at 397.  "An officer's evil intentions will not make a Fourth Amendment violation out of . . . objectively reasonable" conduct, "nor will an officer's good intentions make . . . objectively unreasonable . . . [conduct] constitutional."  Id.; see also Scott v. United States, 436 U.S. 128, 138 n.12 (1978) (collecting cases).  Spinelli's claim that one or more officers had an ulterior motive for the search is irrelevant to the issue of whether the search itself violated the Fourth Amendment.

Spinelli also argues that because the search was warrantless and not conducted pursuant to established regulations, it was necessarily unreasonable.  Spinelli claims that the only applicable regulation that permits the police to search a gun store's premises in New York City is 38 RCNY § 1-06(i), which creates a "cooperative inspection program" whereby gun store owners can set up a time for a voluntary police inspection.  Spinelli, however, overlooks a separate provision of the applicable regulations, 38 RCNY § 4-06(a)(3), that provides that the gun dealer's "premises and firearms[] shall be subject to inspection at all times by members of the Police Department."

-12-

(Emphasis added). Spinelli's allegations that "the Regulations make no provision for warrantless searches," and that McSherry "ignored the available procedure," are belied by § 4-06(a)(3).

Nor does the warrantless search authority created by § 4-06(a)(3) violate the Fourth Amendment. The Supreme Court has held that "warrantless administrative searches" are justified where "the burden of obtaining a warrant [would be] likely to frustrate the governmental purpose behind the search." Camara v. Mun. Ct. of San Fran., 387 U.S. 523, 533 (1967). Under certain circumstances, like those presented here, an effective inspection of a gun dealer's premises requires that searches be unannounced in order to discover potential security infractions. See United States v. Biswell, 406 U.S. 311, 316 (1972); see also id. ("When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection."); United States v. Streifel, 665 F.2d 414, 419 n.8 (2d Cir. 1981) (concluding that gun dealers have a greatly reduced expectation of privacy because they know that they are subject to a "full arsenal of governmental regulation") (quoting Marshall v. Barlow's Inc., 436 U.S. 307, 313 (1978)). We hold that the warrantless search of Spinelli's store, conducted pursuant to established regulatory authority, was objectively reasonable and did not violate the Fourth

-13-

Amendment.

**III. The Due Process Claim**

Spinelli also alleges that, contrary to the district court's conclusion, the City's conduct did not provide her with the "process that was due." Spinelli argues that the City's letters, advising her that Olinville's license had been suspended for "failure to provide adequate security," did not adequately apprise her of the grounds for the suspension, and that simply providing her with the contact information for the investigating officer was insufficient to afford her a meaningful opportunity to be heard.

**A.    Did Spinelli Have A Protected Property Interest In Her Gun Dealer License?**

To succeed on a claim of procedural due process deprivation under the Fourteenth Amendment -- that is, a lack of adequate notice and a meaningful opportunity to be heard -- a plaintiff must first establish that state action deprived him of a protected property interest. <u>Sanitation</u>, 107 F.3d at 995. Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are not created by that amendment; they are defined by "existing rules or understandings that stem from an independent source such as state law." <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972). When alleging a property interest in a public benefit, the plaintiff must show "a legitimate claim of entitlement" to such interest that is

-14-

grounded in established law.  Id.

The district court believed that, because the City had "broad discretion" over whether to grant or deny Olinville's gun dealership license, Spinelli had no protected property interest in the license, and thus her due process claim could not succeed. We do not agree.  While a person does not have a protected interest in a "possible future [business] license," Sanitation, 107 F.3d at 995, the situation changes once the license is obtained, see Dwyer v. Regan, 777 F.2d 825, 830-31 (2d Cir. 1985).  While a "possible future license" involves a purely speculative property interest, once the government has granted a business license to an individual, the government cannot "depriv[e] [the individual of] such an interest . . . without appropriate procedural safeguards."  Arnett v. Kennedy, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part).  See Bell v. Burson, 402 U.S. 535, 539 (1971) ("Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood.").

Although there may be no protected property interest where the licensor has broad discretion to revoke the license, see Bach v. Pataki, 408 F.3d 75, 80-81 (2d Cir. 2005), here, such discretion was carefully constrained.  The relevant regulations provided that, under specific circumstances, the City could revoke or suspend Spinelli's gun dealer license, 38 RCNY § 4-

04(*l*), but the City did not have unfettered discretion to do so. Unlike the gun carrier permits in the cases cited by the district court, see Bach, 408 F.3d 75; Potts v. City of Phila., 224 F. Supp. 2d 919 (E.D. Pa. 2002), over which the government had "considerable discretion" to suspend or revoke a license, Bach, 408 F.3d at 79, the City's discretion in this case was cabined by the regulations' "good cause" requirement, see 38 RCNY § 4-04(*l*). See, e.g., Dwyer, 777 F.2d at 827 (plaintiff's employment could only be terminated for "incompeten[ce]" or "misconduct"). Where a license can be "suspended only upon a satisfactory showing" of misconduct, the licensee has "a property interest in his license sufficient to invoke the protection of the Due Process Clause." Barry v. Barchi, 443 U.S. 55, 64 (1979); see Richardson v. Town of Eastover, 922 F.2d 1152, 1157 (4th Cir. 1991) ("[A] state-issued license for the continued pursuit of the licensee's livelihood, renewable periodically on the payment of a fee and revocable only for cause, creates a property interest in the licensee."). Thus, the district court erred in holding that Spinelli did not have a property interest in her gun dealer license that could be protected by the Due Process Clause.

**B.   Was Spinelli Denied Due Process?**

The district court also concluded that Spinelli received "all the process that was due" when the City deprived her of her gun dealer license and firearms. The touchstone of due process,

-16-

of course, is "the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" Mathews, 424 U.S. at 348-49 (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)); see also Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (requiring an "opportunity to be heard . . . at a meaningful time and in a meaningful manner") (internal quotation marks and citations omitted). However, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). "The 'timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved.'" Krimstock v. Kelly, 306 F.3d 40, 51-52 (2d Cir. 2002) (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982)). In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest. Mathews, 424 U.S. at 335.

Applying the Mathews test to this case, the district court found that although Spinelli had "some private interest in the vouchered guns taken by" the City, the City gave Spinelli an adequate notice and opportunity to be heard by negotiating with her counsel over the deprivation, which resulted in the

-17-

reinstatement of her license and return of her firearms. The district court also found that there were "'exigent' circumstances" justifying the City's conduct, which argued "strong[ly]" in favor of the public interest. Thus, the district court concluded that the Mathews factors weighed in favor of the City, and dismissed Spinelli's due process claim.

On appeal, Spinelli challenges the district court's Mathews analysis, arguing that (1) she had a strong interest in retaining her license and firearms, (2) there was a high risk of erroneous deprivation because the City provided her with neither a meaningful opportunity for a hearing nor adequate notice of the grounds for her suspension, and (3) the City's claim of an "urgent need" to seize the firearms and suspend her license was insufficient to justify denying her a pre-deprivation hearing, much less a post-deprivation one.

### 1. Pre-Deprivation Due Process

We disagree with Spinelli's contention that she was entitled to pre-deprivation due process. "[A]lthough notice and a pre[-]deprivation hearing are generally required, in certain circumstances, the lack of such pre[-]deprivation process will not offend the constitutional guarantee of due process, provided there is sufficient post[-]deprivation process." Catanzaro v. Weiden, 188 F.3d 56, 61 (2d Cir. 1999). "[N]ecessity of quick action by the State or the impracticality of providing any

-18-

meaningful pre[-]deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." Id. (internal quotation marks and citation omitted).

Here, "exigent" circumstances necessitating "very prompt action" on the part of the City were sufficient to justify the City's failure to provide Spinelli with pre-deprivation notice or a hearing. United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 903 (2d Cir. 1992) (citing Fuentes, 407 U.S. at 91-92). The City and the public have a strong interest in ensuring the security of gun shops, which was heightened further in the days immediately following the September 11th terrorist attacks, when the dimensions of the terrorist threat were unknown. Additionally, the search and the suspension were taken pursuant to the City's regulatory authority; the search was conducted pursuant to 38 RCNY § 4-06(a)(3), and the suspension was authorized by 38 RCNY § 1-04(f). See All Assets, 971 F.2d at 903.

The record demonstrates that the City had sufficient cause to take "prompt action" to address the security infractions at Olinville observed by Officer McSherry. Spinelli, while downplaying these infractions, has never disputed them, and indeed, took strong measures to remedy them. Were we to conclude

-19-

that prompt action was not required, we would tie the hands of police faced with obvious security lapses at gun stores until a hearing could be held, and thereby "substantially undermine the state interest in public safety." Mackey v. Montrym, 443 U.S. 1, 18 (1979). Under the circumstances presented to the police on October 8, the City was not required to provide Spinelli with pre-deprivation due process before suspending her license and seizing her firearms. However, our inquiry does not end there.

### 2. Post-Deprivation Due Process

Spinelli's primary argument on appeal is that the City never provided her with the opportunity for a meaningful post-deprivation notice and hearing despite her entitlement to one under the City's own regulations. Spinelli further alleges, and the City essentially concedes, that in practice the City does not provide licensees with notice or an opportunity for a formal hearing until after the police investigation is completed, which the City acknowledges can take "months or years." Again, we turn to the Mathews factors, now in the post-deprivation context.

### a. The First Mathews Factor

First, the private interest implicated in this case is strong. Spinelli's "private interest is the interest in operating a business and, stated more broadly, pursuing a particular livelihood." See Tanasse v. City of St. George, No. 97-4144, 1999 WL 74020, at *3 (10th Cir. Feb. 17, 1999) (citing

-20-

_Dixon v. Love_, 431 U.S. 105, 113 (1977)).  The Supreme Court has "repeatedly recognized the severity of depriving someone of his or her livelihood."  _FDIC v. Mallen_, 486 U.S. 230, 243 (1988).  Moreover, "[b]ecause of the nature of this interest, a licensee erroneously deprived of a license cannot be made whole" simply by reinstating the license.  _Tanasse_, 1999 WL 74020, at *3.  "In fact, the interim period between erroneous deprivation and reinstatement can be financially devastating to the licensee."  _Id._  The district court's conclusion that "the extent of [Spinelli's] interest [in her deprived property] is not entirely clear to the Court," led it to erroneously discount Spinelli's interest in both her gun dealer license and her seized firearms.  Without firearms to sell, Spinelli could not do business as a gun dealer at all, whether or not she had a dealer license.  The first _Mathews_ factor favors Spinelli.

### b.     The Second _Mathews_ Factor

Next, we consider "the risk of an erroneous deprivation" under "the procedures used" by the City, along with "the probable value, if any, of additional or substitute procedural safeguards."  _Mathews_, 424 U.S. at 335.  Spinelli argues that the post-deprivation procedures used by the City did not adequately afford her due process because they failed to provide either adequate notice or a meaningful opportunity to be heard in a sufficiently timely manner.  We agree.

-21-

### i.  Notice

"Notice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity." In re Gault, 387 U.S. 1, 33 (1967) (internal quotation marks omitted). The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations.  The degree of required specificity also increases with the significance of the interests at stake.  Here, these interests, implicating "the practice of one's chosen profession," Galvin v. N.Y. Racing Ass'n, 70 F. Supp. 2d 163, 176 (E.D.N.Y. 1998), are "substantial," Barry, 443 U.S. at 64.

The notice actually provided in this case was constitutionally inadequate.  The regulations specified that a license suspension will result in "the issuance of a Notice of Determination Letter to the licensee, which shall state in brief the grounds for the suspension or revocation and notify the licensee of the opportunity for a hearing."  38 RCNY § 1-04(f). Had this regulation been complied with, the notice might have been sufficient, depending on the specificity of the grounds provided and the promptness of the hearing.  The cursory letters sent to Spinelli, however, only informed her of the license

-22-

suspension and the status of the investigation.  Beyond the conclusory statement that security at Olinville was inadequate, there was no specificity as to the actual infractions.  Spinelli was left to guess at the security breaches to which the letters referred.  The "notice" given to Spinelli plainly failed to "reasonably . . . convey the required information" that would permit her to "present [her] objections" to the City.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

The City relies on the fact that Chambers, Spinelli's able counsel, through successful investigation, was able to determine the factual nature of the charges.  But adequate notice consists of more than not obstructing a lawyer's investigation.  The fact that Spinelli's counsel eventually learned of the specific nature of the charges after meeting on various occasions with the City does not obviate the City's failure to provide adequate notice of those charges.  The City has advanced no legitimate reason for not immediately providing Spinelli with the information she needed to prepare meaningful objections or a meaningful defense.[4] Notifying Spinelli of the specific security breaches at Olinville would have entailed little or no administrative inconvenience to the City; indeed, simply attaching Officer McSherry's report to

---

[4]     Spinelli's claim of purposeful inadequacy of notice based on the malicious intent of certain members of the 47th Precinct to close Olinville for their benefit, as previously noted, is without support in the record.

-23-

the letters would have sufficed.  The "notice" provided in this case was scarcely more than a "gesture" on the City's part, see Luessenhop v. Clinton County, N.Y., 466 F.3d 259, 269 (2d Cir. 2006), and was not constitutionally adequate.

### ii.  Opportunity To Be Heard

Despite the inadequate notice, Spinelli, with counsel's assistance, was able to reinstate her gun dealer license 58 days after its suspension.  The City argues that, because Spinelli was able to have her license suspension lifted and to retrieve her property in less than two months, her due process rights were not violated.  This is a non-sequitur.  Spinelli's eventual success did not result from the City's affording her due process, but despite its absence.

The City contends that because Spinelli voluntarily opted not to pursue a formal hearing through the administrative process, and instead chose to have her attorney negotiate with the City, she cannot challenge the City's process, which she never utilized.  We do not think that Spinelli's being forced into self-help by the inadequacy of process can bar her from pressing this claim.  The unstated premise of the City's argument is that Spinelli could have received a prompt hearing if she had wanted one.  In fact, the contrary is true.  The administrative hearing process was not available to Spinelli during the City's pending investigation into McSherry's report.  Both Sergeant

-24-

Kaplon, the officer in charge of the investigation, and Margaret Shields, a hearing officer in the License Division, testified that Spinelli would not have been entitled to a hearing until the completion of the investigation into McSherry's report, which Shields conceded could take "months to . . . years" to decide.

Furthermore, although due process may tolerate some period of delay between a deprivation of property and a hearing, there is no justification for indeterminately delaying a hearing for a person in Spinelli's circumstances while the investigation runs its course.  In Mallen, the Supreme Court held that,

> [i]n determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

486 U.S. at 242; see id. (noting that "the significance of such a delay [on due process] cannot be evaluated in a vacuum").

Here, the City's blanket policy of only providing a hearing after the investigation is completed cannot be squared with due process.  As we have noted, in this case the private interest was strong, and the City's delay in providing Spinelli with a prompt hearing while her business was closed threatened significant financial loss over an extended period.  The City's concession that an investigation can take "months to years to decide," negates any claim that Spinelli's investigation could be

-25-

completed in a reasonable amount of time.  As a blanket proposition, where livelihoods may be at stake and the timing is subject to the competences of varying investigators, the holding of a hearing possibly years after a license suspension cannot amount to a "justif[iable] . . . delay."  Id.  See Cain v. McQueen, 580 F.2d 1001, 1006 (9th Cir. 1978) (plaintiff's due process rights violated where school district delayed formal hearing for two years); Brown v. Bathke, 566 F.2d 588, 593 (8th Cir. 1977) (same).

Nor does such a delay serve any important "underlying governmental interest."  Mallen, 486 U.S. at 242.  In fact, we believe the contrary to be true:  Permitting a licensee both to promptly join issue with the grounds for the investigation and to present her views advances the City's understanding of the situation while facilitating prompt remediation, all in the public interest.  The usefulness of a prompt hearing is exemplified by the instant case -- had Spinelli not been able to afford an attorney, the City would have incurred significant costs by investigating the Olinville security lapses, only to determine months or years later that Spinelli could have remedied the situation with a few basic improvements to Olinville.  In the meantime, the delay would have wiped out Spinelli's livelihood.

We have no doubt that the delay conceded by the City would have violated Spinelli's due process rights.  But what about the

-26-

actual delay in this case that was limited to fifty-eight days due to Spinelli's self-help?  Notwithstanding that ultimately it did not take years for the City to restore Spinelli's license and return her firearms, we conclude that the delay Spinelli actually experienced still exceeded the bounds of due process.

"[E]ven a brief and provisional deprivation of property pending judgment is of constitutional importance."  Krimstock, 306 F.3d at 51-52; see Fuentes, 407 U.S. at 84-85 ("[I]t is now well settled that a temporary, non[-]final deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."); see also United States v. Monsanto, 924 F.2d 1186, 1192 (2d Cir. 1991) (en banc) (noting that a "temporary and non[-]final" removal of a defendant's assets, pursuant to a federal criminal forfeiture statute and pending resolution of the criminal case, "is, nonetheless, a deprivation of property subject to the constraints of due process") (quotation marks omitted).  Thus, once the City took possession of Spinelli's property pending investigation, it was incumbent upon the City to provide a prompt hearing.  The fact that Spinelli was able to retain an attorney familiar with the licensing system does not cure the City's failure to provide constitutionally adequate process by which Spinelli could be heard.

In sum, nothing about the process employed by the City in

this case provided any "safeguards [against] an unacceptable risk of arbitrary and erroneous deprivations" of personal liberties. Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 793 (2005) (Stevens, J., dissenting) (internal quotation marks and alterations omitted).  The fact that through Spinelli's efforts the period of her deprivation was reduced to fifty-eight days neither cures the constitutional infirmity, nor erases the "risk" of erroneous deprivation inherent in the City's policy.  Thus, the second Mathews factor also favors Spinelli.

### c.    The Third Mathews Factor

The third Mathews factor examines "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Mathews, 424 U.S. at 335. The district court concluded that the third Mathews factor weighed in the City's favor because, in the post-September 11th environment, the City had to act quickly in response to the perceived security lapses.  According to the district court, "the seizure of the guns was necessary to secure an important public interest, [and] there was a need for prompt action [by the NYPD]."

The district court, however, applied the third Mathews factor by weighing the City's interest only with respect to pre-deprivation due process, not post-deprivation due process.  In

the latter context, the existence of "exigent circumstances" warranting a deprivation before holding a hearing is irrelevant. The relevant inquiry is whether the City had a legitimate interest in not providing Spinelli with meaningful post-deprivation due process.

Our decision in Krimstock v. Kelly is instructive. The Krimstock plaintiffs challenged a City statute that permitted the City to hold motor vehicles that were seized as a result of DWI offenses, but had not yet been subject to an actual forfeiture proceeding (i.e., "post-seizure, pre-judgment" vehicles). 306 F.3d at 48. In assessing the third Mathews factor, the City argued that drivers should not be permitted to challenge the validity of the City's retention of their vehicles prior to final judgment, because (1) the drivers could sell the vehicles prior to the forfeiture proceedings, id. at 64-65, and (2) the possibility existed that the drivers might commit another DWI, creating an "executive urgency," id. at 66. We concluded that there were other means of ensuring that the vehicles would not be sold prior to forfeiture, id. at 65, and that the "urgency" that permitted the City to seize the vehicles without a pre-deprivation hearing did not extend to the post-deprivation context, because by that time the drivers would have regained their sobriety, thereby eliminating the "executive urgency," id. at 66. We held that, "promptly after their vehicles are seized .

. . as alleged instrumentalities of crime, plaintiffs must be given an opportunity to test the probable validity of the City's deprivation of the vehicles." Id. at 70.

Here, the City's asserted reasons for denying Spinelli a prompt post-deprivation hearing are similar to those it advanced in Krimstock, namely, that the urgent security situation in post-September 11th New York City required the suspension of Spinelli's license and seizure of her firearms without providing due process. But this logic only explains the absence of a pre-deprivation hearing; it does not explain why Spinelli should not be allowed to promptly challenge the City's actions after the suspension and seizure. The City's policy is to deny a dealer such as Spinelli her livelihood for an indeterminate period, possibly years, even if the circumstances that led to the City's action have been remedied or never existed at all. Not only is there no benefit to the City from such a hearing delay pending investigation, but the unnecessary deprivation of the citizen's livelihood actually incrementally threatens to harm the City, which is deprived of sales taxes, while increasing the likelihood of the administrative and fiscal burdens of an unnecessary investigation. Thus, the third Mathews factor favors Spinelli.

C. **Summary Judgment Should Be Entered In Favor Of Spinelli On Her Due Process Claim.**

Although Spinelli's license has been reinstated and her firearms returned, her due process claim nevertheless remains a

live controversy.  Because she never received the process that she was due, "[D]efendants must still answer for any damages they may have caused with their [suspension of] [her] license without due process."  Ginorio v. Contreras, 409 F. Supp. 2d 101, 108 (D.P.R. 2006).  The district court must permit Spinelli to prove her damages, by computing the loss from the time the City should have provided a prompt post-deprivation hearing until December 5, 2001, when the suspension was lifted and the firearms were returned.[5]

**IV.  The Tortious Interference Claim**

The district court dismissed Spinelli's state-law tortious interference claim for lack of supplemental jurisdiction.  Reversal of Spinelli's due process claim also reinstates the district court's supplemental jurisdiction over her state law claim.  See 28 U.S.C. § 1367; Zheng v. Liberty Apparel Co., 355 F.3d 61, 79 (2d Cir. 2003).  If the aforementioned damages issue is resolved promptly, the district court should then consider whether to retain or dismiss without prejudice Spinelli's tortious interference claim.

**CONCLUSION**

For the foregoing reasons, the district court's judgment is

---

[5]     The question of when a prompt post-deprivation hearing should have been held, and hence the time during which damages would accrue, we leave up to the district court to determine after briefing and in light of the particular circumstances of this case and opinion.

-31-

AFFIRMED with respect to the appellants' Fourth Amendment claim. The district court's judgment is REVERSED with respect to the appellants' due process claim, and the case is REMANDED to the district court to enter summary judgment in favor of the appellants on their due process claim and for the calculation of damages to be awarded to the appellants on that claim. The district court's judgment dismissing the appellants' tortious interference claim is also VACATED, and the cause is REMANDED to the district court for further proceedings consistent with this opinion.