10-0604-cv
Monserrate, et al. v. New York State Senate, et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: March 12, 2010          Decided: March 16, 2010)

Docket No. 10-0604-cv

- - - - - - - - - - - - - - - - - - - -x

HIRAM MONSERRATE, individually and as an
elected official and member of the New
York State Senate, CELESTE RODRIGUEZ,
individually and as duly registered and
qualified voter in the New York State
13th Senatorial District, MICHAEL A.
NARDIELO, III, individually and as duly
registered and qualified voter in the
New York State 13th Senatorial District,
MONIFA AFIA BEY, individually and as duly
registered and qualified voter in the
New York State 13th Senatorial District,
NANCY TORRES, individually and as duly
registered and qualified voter in the
New York State 13th Senatorial District,
LORETTA HENDERSON, individually and as
duly registered and qualified voter in
the New York State 13th Senatorial
District, and MALIKA K. SHABAZZ,
individually and as duly registered and
qualified voter in the New York State
13th Senatorial District,

Plaintiffs-Appellants,

- v.-

NEW YORK STATE SENATE, MALCOLM A. SMITH,
in his official capacity as Temporary
President of the New York State Senate,
ANGELO J. APONTE, in his official

capacity as Secretary of the New York State Senate, THOMAS P. DiNAPOLI, in his official capacity as State Comptroller of the State of New York, ERIC T. SCHNEIDERMAN, in his official capacity as a Senator of the State of New York and Chair of the New York State Senate Select Committee to Investigate the Facts and Circumstances Surrounding the Conviction of Hiram Monserrate on October 15, 2009, DAVID A. PATERSON, in his official capacity as Governor of the State of New York, RICHARD RAVITCH, in his official capacity as Lieutenant Governor of the State of New York, LORRAINE CORTES-VAZQUEZ, in her official capacity as Secretary of State for the State of New York,

                    Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - -x


    Before:        JACOBS, Chief Judge, LYNCH, Circuit
                   Judge, and RESTANI, Judge.*

    Appeal from an interlocutory order of the United States

District Court for the Southern District of New York

(Pauley, J.), denying a preliminary injunction that would

have unwound the expulsion of Hiram Monserrate from the New

York State Senate.  We affirm.

                              NORMAN SIEGEL, New York, NY, for
                              Appellants.

---

* The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

STEVEN J. HYMAN (Alan E. Sash and Rachel Nicotra, on the brief), McLaughlin & Stern, LLP, New York, NY, for Appellants.

BARBARA D. UNDERWOOD, Solicitor General of the State of New York (Peter Karanjia, Special Counsel to the Solicitor General, and Sasha Samberg-Champion and Diana R.H. Winters, Assistant Solicitors General, on the brief), Office of Andrew M. Cuomo, Attorney General of the State of New York, for Appellees.

DENNIS JACOBS, Chief Judge:

Hiram Monserrate, who has been expelled from the New York State Senate, along with six voters in New York's 13th Senatorial District who voted for Monserrate (the "Monserrate voters") (collectively, the "Monserrate Appellants"), pursue this expedited appeal from the denial of a preliminary injunction in the United States District Court for the Southern District of New York (Pauley, J.). The requested preliminary injunction sought primarily to unwind Monserrate's expulsion and to cancel the Special Election scheduled for March 16, 2010. We affirm.

**I**

On November 4, 2008, Monserrate received approximately

3

66 percent of the votes cast in New York's 13th Senatorial District, thereby winning election to a two-year term as State Senator. On January 7, 2009, he took the oath of office and assumed a seat in the Senate.

On December 19, 2008--after the election but before the oath of office--a woman suffered injuries to her face and left arm in Monserrate's apartment and in the common area of his apartment building.

After assuming a seat in the Senate, Monserrate was indicted on three felony and three misdemeanor counts of assault arising out of the December incident. On October 15, 2009, Monserrate was convicted of one count of misdemeanor reckless assault after a bench trial in New York Supreme Court, Queens County.[1] On December 4, 2009, he was sentenced to three years of probation, 250 hours of community service, one year of domestic-abuse counseling, and a $1,000 fine. A "family offense" order of protection required Monserrate to refrain from any contact with the

---

[1] Pursuant to New York Penal Law § 120.00(2), a person is guilty of assault in the third degree when he "recklessly causes physical injury to another person."

4

woman for a period of five years.[2] Monserrate has appealed from his judgment of conviction; the appeal remains pending.

On November 9, 2009--after Monserrate's conviction but prior to his sentencing--the Senate adopted Resolution 3409, formally establishing a "Select Committee to Investigate the Facts and Circumstances Surrounding the Conviction of Hiram Monserrate on October 15, 2009" (the "Select Committee"). Resolution 3409 recited the "seriousness of the[] domestic violence charges" brought against Monserrate, found that "the circumstances surrounding [the charges] warrant further investigation by the Senate," and observed that those circumstances "may warrant the imposition of sanctions by the Senate." The Select Committee was "authorized and directed to investigate the facts and circumstances relating to the conviction against Senator Monserrate," and was required to "report to the Senate with its recommendations." Resolution 3409 also directed the Select Committee to "ensure a full and fair investigation, ensure fairness in

---

[2] A "family offense" order of protection may be granted "[w]hen a criminal action is pending involving a complaint charging any crime or violation between spouses, former spouses, parent and child, or between members of the same family or household . . . ." N.Y. Crim. Proc. Law § 530.12(1).

5

the hearing process, specifically providing Senator Monserrate and his counsel with notice of all public committee proceedings, as well as ensuring opportunities for Senator Monserrate to be heard."

The Select Committee convened on six occasions. It reviewed, <u>inter alia</u>, the trial record, certain grand jury testimony, phone records, a notarized statement by the victim, and Monserrate's media interviews. Monserrate declined the invitation to present arguments and evidence in person, through counsel, or in writing.

The unanimous report of the Select Committee (the "Report"), issued January 13, 2010, recommended that Monserrate be expelled or that he be censured with revocation of privileges:

> Having considered the available evidence and evaluated the facts relating to the conduct that provided the basis for Senator Monserrate's conviction, the Select Committee finds that this case is serious enough to warrant a severe sanction. In doing so, we are mindful that ultimately, the voters of Senator Monserrate's district, where he plans to run for re-election, will decide whether or not he is returned to office.
>
> The Select Committee finds that the nature and seriousness of Senator Monserrate's conduct, as demonstrated by the surveillance video and other unrebutted evidence outlined in this Report, showed a reckless disregard for Ms. Giraldo's

6

well-being and for the severity of her injury. We therefore find, that under the particular facts and circumstances presented here, Senator Monserrate's misconduct damages the integrity and the reputation of the New York State Senate and demonstrates a lack of fitness to serve in this body.

Accordingly, the Select Committee recommends that Senator Monserrate be sanctioned by the full Senate, and that the Senate vote to impose one of two punishments: expulsion, or in the alternative, censure with revocation of privileges.

The Special Committee further concluded that (i) "Senator Monserrate's assault . . . was a crime of domestic violence and therefore in direct contravention of New York's well-established 'zero-tolerance' policy in such matters," and (ii) "Senator Monserrate has failed to accept responsibility for his misconduct, or to cooperate in any way with the work of the Select Committee."

On February 9, 2010, the Senate voted 53 to 8 to expel Monserrate. Resolution 3904 "condemn[ed] the conduct of Senator Monserrate surrounding his conviction for reckless assault" and concluded that his "behavior has brought disrepute on the Senate, and damaged the honor, dignity and integrity of the Senate." The Senate resolved that such conduct "is incompatible with the duties of the Senate to uphold public confidence in government and promote the

7

administration of justice under law," and further resolved that Monserrate's actions "in totality are not compatible with the responsibilities of the office, and with the qualifications and behavior expected of and by a State Senator of New York."

On February 10, 2010, Governor David A. Paterson proclaimed a Special Election to be held on March 16, 2010. On February 11, 2010, the Monserrate Appellants filed this action pursuant to 42 U.S.C. § 1983 seeking a temporary restraining order and a preliminary injunction. The same day, the district court denied the motion for a temporary restraining order. On February 19, 2010, the district court denied the motion for a preliminary injunction. The Monserrate Appellants timely appealed and this Court granted their motion for an expedited appeal.


**II**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008). "We review the denial of a preliminary injunction for abuse of discretion." Lynch v. City of N.Y., 589 F.3d 94, 99 (2d Cir. 2009). "A

district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." Id. (internal quotation marks omitted).

**A**

The Second Circuit has articulated the following standard for granting a preliminary injunction:

> In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

Id. at 98 (internal quotation marks omitted). However, a plaintiff cannot rely on the "fair ground for litigation" alternative in challenging "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989). The Monserrate Appellants therefore must establish a likelihood of success on the merits to

succeed on appeal.[3]

The district court did not err in determining that the Monserrate Appellants failed to establish a likelihood of success on the merits of any of the three claims they press on appeal.

---

**B**

The voting rights claim asserts that Monserrate's expulsion violates voting rights under the First and Fourteenth Amendments of the United States Constitution, but is largely ambiguous as to the specific rights that are

---

[3] Because we conclude that the Monserrate Appellants fail to establish a likelihood of success on the merits of any of the claims they press on appeal, several issues are obviated: (i) whether they establish irreparable injury; (ii) whether their requested relief is properly framed as a mandatory preliminary injunction or a prohibitory preliminary injunction, see Mastrovincenzo v. City of N.Y., 435 F.3d 78, 89 (2d Cir. 2006); and (iii) any tension between the Second Circuit standard set forth above the line and the Supreme Court's recent articulation of the preliminary injunction standard, see Winter, 129 S. Ct. at 374 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). The third issue is obviated because the Monserrate Appellants fail to establish a likelihood of success on the merits of any claim, a failure that is fatal under both standards.

10

infringed.  However, assuming that Monserrate's expulsion burdens constitutional rights related to voting and political association, any such burden is justified by the state interest in maintaining the integrity of the Senate.

**Flexible Framework**.  The district court did not err in declining to apply strict scrutiny; indeed, it is an "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." Burdick v. Takushi, 504 U.S. 428, 432 (1992).  Rather, it is useful to look to "a more flexible standard" in which "the rigorousness of our inquiry into the propriety of a state [action] depends upon the extent to which a challenged [action] burdens First and Fourteenth Amendment rights." Id. at 434.  When such "rights are subjected to severe restrictions, the [action] must be narrowly drawn to advance a state interest of compelling importance"; but when such rights are subjected to less than severe burdens, "the State's important . . . interests are generally sufficient to justify the restrictions." Id. (internal quotation marks and citations omitted); see also Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (directing courts to balance "the character and magnitude of the asserted injury" against "the

11

precise interests put forward by the State as justifications for the burden imposed"); accord Schulz v. Williams, 44 F.3d 48, 56 (2d Cir. 1994). Therefore, if the burden imposed is less than severe and reasonably related to the important state interest, the Constitution is satisfied.

It seems clear enough that this flexible framework, used in ballot access cases, is not limited to the pre-vote context. The Supreme Court "minimized the extent to which voting rights are distinguishable from ballot access cases," Burdick, 504 U.S. at 438, because "the rights of voters and the rights of candidates do not lend themselves to neat separation," Bullock v. Carter, 405 U.S. 134, 143 (1972). Furthermore, the Monserrate Appellants fail to offer a persuasive reason why we should not be guided by this flexible framework in the post-vote context.

**Less than severe burden.** For at least two reasons, the district court did not err in determining that Monserrate's expulsion imposed a less than severe burden. To "evaluate the weight of the burden imposed by" Monserrate's expulsion, "we proceed by the totality approach." Schulz, 44 F.3d at 56 (internal quotation marks omitted).

First, the district court properly reasoned that the

12

Special Election will reduce any burden imposed on voting rights. It will (i) reduce the amount of time that the voters of the 13th Senatorial District are without representation, (ii) allow those voters to exercise their voting rights anew, and (iii) provide those voters an opportunity to re-elect Monserrate should they choose to do so following his misdemeanor conviction. That there would be no Special Election but for Monserrate's expulsion, does not diminish the Special Election's value.

Second, the district court properly found that the burden (if any) imposed by a Senator's resignation or death is a useful analog to the burden (if any) imposed by Monserrate's expulsion. In their reply brief, the Monserrate Appellants concede that a vacancy automatically created by operation of New York Public Officers Law § 30(1)(e)--based on a conviction for a felony or a crime involving a violation of the oath of office--need not "pass muster under equal protection analysis." The impact on voting rights is the same whether the vacancy arises by death or expulsion.

**Justification.** The district court did not abuse its discretion in determining that Monserrate's expulsion

13

vindicates an important state interest in maintaining the integrity of the Senate. It is fundamental that a legislature has an important interest in upholding its reputation and integrity. See, e.g., In re Chapman, 166 U.S. 661, 668 (1897) (recognizing that Congress "necessarily possesses the inherent power of self-protection"); French v. Senate of State of Cal., 146 Cal. 604, 606 (1905) ("[E]very legislative body in which is vested the general legislative power of the state, has the implied power to expel a member for any cause which it may deem sufficient."); Hiss v. Bartlett, 69 Mass. 468, 473 (1855) ("The power of expulsion is a necessary and incidental power, to enable the house to perform its high functions, and is necessary to the safety of the State. It is a power of protection."). Although "[n]o power to . . . expel a member, is contained in the [New York] State Constitution . . . . [t]he necessity of [such a] power[] . . . is apparent, and is conceded in all the authorities." People ex rel. McDonald v. Keeler, 99 N.Y. 463, 481 (1885).

Moreover, Monserrate's expulsion is reasonably related to securing the Senate's integrity. Resolution 3904 recognized New York's "zero tolerance policy for domestic

14

violence," determined that Monserrate's conduct "is incompatible with the duties of the Senate to uphold public confidence in government and promote the administration of justice under law," and is "in totality . . . not compatible with the responsibilities of the office, and with the qualifications and behavior expected of and by a State Senator of New York."  Given these determinations, Monserrate's expulsion is reasonably related to protecting the Senate's integrity.[4]

Accordingly, the district court did not abuse its discretion in determining that the flexible framework articulated in <u>Burdick</u>, <u>Anderson</u>, and <u>Schulz</u> is useful to analyzing any burden on voting rights imposed by post-

---

[4] The Monserrate Appellants misconstrue the relevant state interest.  The district court remarked that "New York has an interest in the orderly operation of its legislature."  Based on this remark, the Monserrate Appellants argue that such an interest cannot justify Monserrate's expulsion because the conduct at issue occurred prior to Monserrate's assumption of a Senate seat and does not bear on his Senate responsibilities.  This argument ignores the district court's further explication of the state interest: "In concluding that Monserrate 'severely damaged the institution's honor, dignity, integrity, and public reputation,' the Senate articulated its legitimate state interest."  The district court did not abuse its discretion in determining that the Senate's "exercise of the expulsion power was a reasonable way to satisfy that interest."

15

election actions; that any burden imposed by Monserrate's expulsion is less than severe; and that the protection of the Senate's integrity justifies the expulsion. The Monserrate Appellants thus fail to establish a likelihood of success on the merits of the voting rights claim.

**Equal Protection**. The Monserrate Appellants, relying on two district court cases from the 1970s, raise the subsidiary argument (sounding in equal protection), that during the period between Monserrate's expulsion and the Special Election--approximately five weeks--the citizens of the 13th Senatorial District lacked representation that citizens in other districts enjoyed. See Kucinich v. Forbes, 432 F. Supp. 1101, 1117 (N.D. Ohio 1977) (finding that "different classes of voters were established by [the] City Council's suspension of Gary Kucinich"); Ammond v. McGahn, 390 F. Supp. 655 (D.N.J. 1975) (finding that the exclusion of a state senator from her party's caucus "created two classes of voters. One class consists of those citizens whose Senators could effectively participate fully in the legislative process and another class whose Senator could participate only to a limited degree."), rev'd on other grounds, 532 F.2d 325 (3d Cir. 1976). But they

16

concede that a vacancy arising when a Senator resigns or is convicted of a felony is not subject to equal protection analysis.  Since (as discussed above) the impact of such a vacancy on voters' rights is identical to the impact of Monserrate's expulsion, the concession is fatal.

Moreover, concession or no concession, the voters of every Senatorial District are alike subject to the expulsion of their elected representative pursuant to Legislative Law § 3.  See Rodriguez v. Popular Democratic Party, 457 U.S. 1, 10 (1982) ("[T]he Puerto Rico statute at issue here does not . . . afford unequal treatment to different classes of voters or political parties. . . . [T]he interim appointment provision applies uniformly to all legislative vacancies, whenever they arise.").  The Monserrate Appellants do not contend that the Senate was motivated to expel Monserrate by any invidious bias against the voters of the 13th Senatorial District.

Accordingly, the Monserrate Appellants fail to establish a likelihood of success on the merits of the subsidiary argument.

**C**

17

The Monserrate Appellants challenge Legislative Law § 3 on the grounds of as-applied and facial vagueness and overbreadth. Prudence dictates that a federal court should exercise a respectful reluctance to interfere in the measures taken by a state legislature to regulate its affairs, discipline its members, and protect its integrity and good name.

Considerations of prudence aside, a comparison of Legislative Law § 3 with Article I, section 5 of the United States Constitution provokes considerable skepticism of the Monserrate Appellants' federal due process challenges. Legislative Law § 3 provides that "[e]ach house has the power to expel any of its members, after the report of a committee to inquire into the charges against him shall have been made." N.Y. Legis. Law § 3. The United States Constitution, Article I, section 5, provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." It is not absolutely clear that the "disorderly Behaviour" ground for punishment in any way limits Congress's expulsion power. Even assuming it does, the wording does little to guide, channel, or limit

18

that power.[5]  Legislative Law § 3 is (as vigorously argued) quite vague, but it is not appreciably more vague than the counterpart provision in the United States Constitution. And it would therefore be anomalous to rule that the Constitution prohibits a state legislature from exercising, in the regulation of its internal affairs, a latitude comparable to that expressly allowed to Congress.

Moreover, as Appellees persuasively argue, while Legislative Law § 3 establishes certain *procedural* prerequisites to expulsion, it is not the sole source of guidance on the substantive standard to be applied to expulsion decisions.  Rather, the Senate had access to a long tradition, in New York and elsewhere, of assessing the fitness of members of a legislative body to hold office, and the Select Committee made explicit reference to that tradition in making its recommendations with respect to Monserrate.  While this standard is hardly precise, it is difficult to see how a legislature's "inherent power of

---

[5] The Supreme Court offered the following gloss on Article I, section 5: "The right to expel extends to all cases where the offense is such as in the judgment of the Senate is inconsistent with the trust and duty of a member." In re Chapman, 166 U.S. 661, 669 (1897).  This gloss also does little to guide, channel, or limit Congress's expulsion power.

19

self-protection," In re Chapman, 166 U.S. at 668, can be reduced to a more predictable formula.

"The 'void-for-vagueness' doctrine is chiefly applied to criminal legislation.  Laws with civil consequences receive less exacting vagueness scrutiny." Arriaga v. Mukasey, 521 F.3d 219, 222-23 (2d Cir. 2008).  In light of the historical acceptance of an extremely broad standard for legislatures' decisions about the fitness of its members, a court asked in effect to review such a decision appropriately applies a less exacting, and more deferential, test of vagueness than that appropriate in judging statutes that impose criminal punishments on ordinary citizens.  Like Article I, section 5, the standard applied in New York does not fail that test.

The Monserrate Appellants thus fail to establish a likelihood of success on the merits of their challenge to Legislative Law § 3.

**D**

The Monserrate Appellants press a claim that Monserrate was deprived of a liberty interest in his reputation without due process of law--a so-called "stigma-plus" claim.  To

20

prevail on such a claim, they must prove "(1) the utterance of a statement . . . that is injurious to . . . reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks and ellipsis omitted). But, critical to this appeal, "the availability of adequate process defeats a stigma-plus claim." Segal v. City of New York, 459 F.3d 207, 213 (2d Cir. 2006).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). "In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest." Spinelli v. City of N.Y., 579 F.3d 160, 170 (2d Cir. 2009) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

The private interest factor clearly favors the Monserrate Appellants, see Patterson v. City of Utica, 370 F.3d 322, 336 (2d Cir. 2004) (recognizing that a stigma-plus

21

claim affects "the plaintiff's reputational interest, and how that interest can [a]ffect his standing in the community and his future job prospects"), and the government interest factor clearly favors the Appellees, see Segal, 459 F.3d at 215 (recognizing that "[t]he government interest at stake in a stigma-plus claim is its ability to execute and explain its personnel decisions quickly"). The remaining--and decisive--factor concerns the "risk that the false charges against the plaintiff will go unrefuted and that his name will remain stigmatized." Patterson, 370 F.3d at 336. "The risk will vary depending on the effectiveness of the procedures available and the promptness by which they are afforded." Segal, 459 F.3d at 215.

The pre-expulsion process available to Monserrate sufficiently reduced the risk that the charges against him would go unrefuted. "The touchstone of due process, of course, is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." Spinelli, 579 F.3d at 169 (internal quotation marks omitted).

The district court did not abuse its discretion in determining that the notice that Monserrate received was

sufficient. "The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." Id. at 172. Resolution 3409 notes the "seriousness of the[] domestic violence charges" against Monserrate, indicates that "further investigation" into the "circumstances surrounding them" is "warrant[ed]," and further indicates that Monserrate's conduct "may warrant the imposition of sanctions by the Senate." It established "a Select Committee of the Senate to investigate the facts and circumstances surrounding the conviction of Senator Hiram Monserrate" and "authorized and directed" the Select Committee "to investigate th[ose] facts and circumstances." Resolution 3409 thus notified Monserrate of the parameters of the Select Committee's investigation. Moreover, at least one letter from Monserrate's counsel to the Select Committee's counsel argued that expulsion is not a legitimate sanction, thereby acknowledging Monserrate's

23

awareness that expulsion was a possible recommendation.[6]

Nor did the district court abuse its discretion in determining that Monserrate received a sufficient opportunity to be heard. "The timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved." Krimstock v. Kelly, 306 F.3d 40, 51 (2d Cir. 2002) (internal quotation marks omitted). In accordance with New York Civil Rights Law § 73(3), Monserrate's counsel was informed that Monserrate or his counsel could testify and "present arguments or evidence . . . through an oral presentation" or present "arguments or . . . any evidence in writing." Moreover, Monserrate was invited to "submit proposed relevant questions in advance" to be asked by the Select Committee. Monserrate thus had an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken," Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985), but declined to avail himself of that

---

[6] In any event, the core of Monserrate's stigma-plus claim is not that he was deprived of his Senate seat without due process, but that he was deprived of his *reputation* without due process. Whether he had notice that he might be expelled, rather than merely censured, is thus peripheral to his due process contention.

24

opportunity.

Monserrate contends that any such opportunity was impaired because (i) he was not "given copies of the materials considered by the Select Committee," (ii) he was not able to cross-examine the two witnesses that Select Committee staff attorneys interviewed,[7] and (iii) five of the six meetings of the Select Committee were held in executive session, closed to the public.[8] Even if the process Monserrate received did not include these features, he nevertheless received a sufficient opportunity to clear his name--and that is all the Constitution requires.

Accordingly, the district court did not abuse its discretion in determining that the Monserrate Appellants failed to establish a likelihood of success on the merits of

---

[7] The district court observed that "the Select Committee heard from no witnesses but relied on the transcript of Monserrate's criminal trial where he had a strong interest in defending himself." This observation may be misleading. Staff attorneys of the Select Committee interviewed two individuals, Mr. Nieves and Mr. Castro, in connection with a notarized statement by the victim of Monserrate's assault, and reported on those interviews to the Select Committee on January 13, 2010.

[8] The transcripts of the Select Committee meetings were posted on the internet on January 19, 2010, after the Report issued but well in advance of the Senate's February 9, 2010 vote to expel Monserrate.

the stigma-plus claim.[9]

**CONCLUSION**

The district court did not abuse its discretion in determining that the Monserrate Appellants failed to establish a likelihood of success on the merits of any of the claims they press on appeal.  We thus need not reach any of the other arguments advanced by the parties.  For the foregoing reasons, we affirm the district court's denial of the preliminary injunction.

---

[9] Even if Monserrate were to prevail on his stigma-plus claim, the appropriate remedy presumably would be a "name-clearing" hearing and/or damages, rather than an injunction reinstating him in the Senate and cancelling the Special Election.