10-4265(L)
Oneida Nation of New York v. Cuomo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Argued: March 15, 2011          Decided: May 9, 2011)

Docket Nos. 10-4265(L); 10-4272(con); 10-4598(con);
10-4758(con); 10-4477(XAP); 10-4976(XAP); 10-4981(XAP)

———————————

ONEIDA NATION OF NEW YORK,

*Plaintiff-Appellee*,

SENECA NATION OF INDIANS, ST. REGIS MOHAWK TRIBE, UNKECHAUGE INDIAN
NATION,

*Plaintiffs-Appellees-Cross-Appellants,*

–v.–

ANDREW M. CUOMO, in his official capacity as Governor of New
York, THOMAS H. MATTOX, in his official capacity as Acting
Commissioner of the N.Y. Department of Taxation & Finance,
RICHARD ERNST, in his official capacity as Deputy Commissioner
for the Office of Tax Enforcement for the N.Y. Department of
Taxation & Finance,

*Defendants-Appellants*,

JOHN MELVILLE, in his official capacity as Acting
Superintendent, New York State Police,

*Defendant-Appellant-Cross-Appellee*,

CAYUGA INDIAN NATION OF NEW YORK,

*Intervenor-Appellant.*

Before:    WESLEY, CHIN, and LOHIER, *Circuit Judges*.

Consolidated and expedited appeals from three district court proceedings in which Plaintiffs sought to enjoin enforcement of 2010 amendments to New York's tax law: (1) Plaintiff Seneca Nation of Indians and Intervenor Cayuga Indian Nation of New York appeal from an order of the United States District Court for the Western District of New York (Arcara, *J.*), which denied their motion for a preliminary injunction; (2) Plaintiffs St. Regis Mohawk Tribe and Unkechauge Indian Nation appeal from an order of the United States District Court for the Western District of New York (Arcara, *J.*), which denied their motion for a preliminary injunction; and (3) New York State Defendants appeal from an order of the United States District Court for the Northern District of New York (Hurd, *J.*), which granted plaintiff Oneida Nation of New York's motion for a preliminary injunction.

Plaintiffs all argue that New York's amended tax law interferes with their tribal sovereignty and violates their immunity from state taxation.  We conclude that none of the Plaintiffs has demonstrated a likelihood of success on the merits.  Thus, we hold that the Northern District abused its discretion in granting the Oneida Nation an injunction and the Western District properly denied injunctions to the Seneca Nation, Cayuga Nation, Unkechauge Nation, and Mohawk Tribe.

The order of the Northern District is VACATED. The two orders of the Western District are AFFIRMED.  All stays pending appeal are VACATED and the cases are REMANDED.

RIYAZ A. KANJI (Cory J. Albright, Zach Welcker, Kanji & Katzen, PLLC; Christopher Karns, Owen Herne, Seneca Nation of Indians Department of Justice, Salamanca, NY; Carol E. Heckman, Jeffrey A. Wadsworth, David T. Archer, Harter Secrest & Emery LLP, Buffalo, NY, *on the brief*), Kanji & Katzen, PLLC, Ann Arbor, MI, *for Plaintiff-Appellee-Cross-Appellant Seneca Nation of Indians.*

DAVID W. DEBRUIN (Scott B. Wilkens, Joshua M. Segal, Jenner & Block, LLP; Daniel French, Lee Alcott, French-Alcott, PLLC, Syracuse, NY, *on the brief*), Jenner & Block, LLP, Washington, D.C., *for Intervenor-Appellant Cayuga Indian Nation of New York.*

JAMES M. WICKS (George C. Pratt, Hillary A. Frommer, Farrell Fritz, P.C.; James F. Simermeyer, New York, NY, *on the brief*), Farrell Fritz, P.C., Uniondale, NY, *for Plaintiff-Appellee-Cross-Appellant Unkechauge Indian Nation.*

MICHAEL L. ROY (Marsha K. Schmidt, *on the brief*), Hobbs, Straus, Dean & Walker, LLP, Washington, D.C., *for Plaintiff-Appellee-Cross-Appellant St. Regis Mohawk Tribe.*

MICHAEL R. SMITH (R. Miles Clark, Zuckerman Spaeder, LLP; Peter D. Carmen, Meghan Murphy Beakman, Oneida Nation Legal Department, Verona, NY; Daniel F. Katz, Dennis M. Black, Williams & Connolly, LLP, Washington D.C., *on the brief*), Zuckerman Spaeder LLP, Washington, D.C., *for Plaintiff-Appellee Oneida Nation of New York*.

ANDREW D. BING (Eric T. Schneiderman, Attorney General of the State of New York, Barbara D. Underwood, Solicitor General, Alison J. Nathan, Special Counsel to the Solicitor General, Steven C. Wu, Assistant Solicitor General, *on the brief*), Deputy Solicitor General*, for Defendants-Appellants Andrew M. Cuomo, Thomas H. Mattox, Richard Ernst, and Defendant-Appellant-Cross-Appellee John Melville.*

MICHAEL T. FEELEY (Lisa A. Coppola, *on the brief*), Rupp, Baase, Pfalzgraf, Cunningham & Coppola LLC, Buffalo, NY, *for Amicus Curiae Akwesasne Convenience Store Association.*

3

MICHAEL A. CARDOZO (Eric Proshansky, Aaron M. Bloom, William H. Miller, *on the brief*), Corporation Counsel of the City of New York, New York, NY, *for Amicus Curiae the City of New York.*

RICHARD T. SULLIVAN, Harris Beach PLLC, Buffalo, NY, *for Amicus Curiae New York Association of Convenience Stores.*

THOMAS G. JACKSON (Meagan A. Zapotocky, *on the brief*), Phillips Nizer, LLP, New York, NY, *for Amicus Curiae New York State Association of Tobacco and Candy Distributors, Inc.*[*]

---

WESLEY, *Circuit Judge*:

The Seneca Nation of Indians ("Seneca Nation"), Unkechauge Indian Nation ("Unkechauge Nation"), St. Regis Mohawk Tribe ("Mohawk Tribe"), Cayuga Indian Nation of New York ("Cayuga Nation"), and Oneida Nation of New York ("Oneida Nation") (collectively "Plaintiffs") seek to enjoin amendments to New York's tax law, which are designed to tax on-reservation cigarette sales to non-member purchasers. Plaintiffs argue that the amended tax law interferes with their tribal sovereignty and fails to ensure their access to tax-free cigarettes for personal use. In three separate

---

[*] We grant the outstanding motion of New York State Association of Tobacco and Candy Distributors, Inc. for leave to file an amicus brief. We have received and considered the brief in the disposition of this appeal.

4

district court proceedings, Plaintiffs moved to enjoin New York officials ("State Defendants") from implementing the amended tax law. The Western District denied the preliminary injunction motions of the Seneca and Cayuga Nations (Arcara, *J.*) as well as the Unkechauge Nation and Mohawk Tribe (Arcara, *J.*) but stayed implementation of the amended tax law pending appeal. The Northern District (Hurd, *J.*) granted the Oneida Nation's motion for a preliminary injunction. We conclude that none of the Plaintiffs has demonstrated a likelihood of success on the merits. Thus, we hold that the Northern District abused its discretion in granting the Oneida Nation a preliminary injunction. We also hold that the Western District properly denied injunctions to the Seneca Nation, Cayuga Nation, Unkechauge Nation, and Mohawk Tribe. We therefore vacate the order of the Northern District and affirm the two orders of the Western District. We vacate all stays and remand the cases.

**BACKGROUND**

**I.   New York Tax Law**

New York currently imposes a $4.35 per pack excise tax on all non-exempt cigarettes sold in the State. N.Y. Tax Law § 471(1) (McKinney 2010). The consumer bears the

5

"ultimate incidence of and liability for the tax," *id*. §
471(2), and willful evasion of the tax is a misdemeanor, *id.*
§ 1814(f).[1]  New York's Department of Taxation and Finance
("Department") "precollects" the tax from a limited number
of state-licensed stamping agents, *see id.* § 471(2), and
mandates that these agents be the only entry point for
cigarettes into New York's stream of commerce, N.Y. Comp.
Codes R. & Regs. tit. 20, § 74.3(a)(1)(iii) (2010).
Stamping agents, often wholesalers themselves,[2] purchase tax
stamps from the State and cigarettes from manufacturers.
Before selling the cigarettes to other wholesalers or
retailers, agents must affix a stamp to each pack of
cigarettes to demonstrate payment of the tax.  *Id.*
§ 74.3(a)(2).  Agents incorporate the cost of the stamp into
the pack's price and pass the cost along the distribution
chain to the consumer.  N.Y. Tax Law §§ 471(2),(3).

---

[1] "Within twenty-four hours after liability for the tax accrues, each such person shall file with the commissioner a return in such form as the commissioner may prescribe together with a remittance of the tax shown to be due thereon."  N.Y. Tax Law § 471-a.

[2] Not all cigarette wholesalers are stamping agents.  In describing the amended tax law, however, we use the terms interchangeably.

## II. Cigarette Sales on Indian Reservations

Federal law prohibits New York from taxing cigarette sales to enrolled tribal members on their own reservations for personal use. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 475–81 (1976). New York may, however, tax "[o]n-reservation cigarette sales to persons other than reservation Indians." *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994) (citing *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 160–61 (1980)). The on-reservation sale of both taxable and tax-free cigarettes and New York's limited on-reservation taxing authority complicate collection and enforcement.

In the late 1980s, the Department determined that the volume of untaxed cigarettes that reservation retailers sold "would, if consumed exclusively by tax-immune Indians, correspond to a consumption rate 20 times higher than that of the average New York resident." *Id*. at 65. A substantial number of non-Indian New Yorkers clearly purchased their cigarettes from reservation retailers without paying the tax to either the retailer or the Department. The Department estimated the tax evasion to cost New York $65 million annually. *Id*.

The Department first attempted to collect these taxes in 1988 by promulgating regulations similar to those Plaintiffs now challenge.[3]  The Supreme Court upheld the 1988 regulations, and the scheme appeared ready for implementation.  *See id.* at 78.  The Department never implemented the regulations, however, due to additional litigation, civil unrest, and failed negotiations between the State and individual nations and tribes.[4]  Consequently, the Department repealed the regulations in 1998.  Despite the New York Legislature's repeated efforts to the contrary, the Department adopted a "forbearance" policy and allowed wholesalers to sell untaxed cigarettes to recognized tribes and reservation retailers without restriction.

Under the forbearance policy, non-member evasion of the cigarette tax proliferated.  For example, the Unkechauge Nation has an estimated 376 enrolled members and yearly

---

[3] *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 622–29, *cert. denied*, 131 S. Ct. 353 (2010), contains a political and regulatory history of New York's prior attempts to tax on-reservation cigarette sales to non-member purchasers.  *See also* Note, *A Tale of Three Sovereigns:  The Nebulous Boundaries of the Federal Government, New York State, and the Seneca Nation of Indians Concerning State Taxation of Indian Reservation Cigarette Sales to Non-Indians*, 79 Fordham L. Rev. 2301, 2338-40 (2011).

[4] The issues in this appeal do not turn on the distinction between the title of "nation" or "tribe."  For ease of exposition, when describing the amended tax law we use "tribe" to mean "nation and/or tribe."  When referring to Plaintiffs, we adhere to their titles of Nation or Tribe.

probable demand[5] of 3,240 cigarette cartons (10 packs per carton). Unkechauge retailers purchased approximately 5 million untaxed cigarette cartons from state-licensed stamping agents in 2009 and 3.5 million untaxed cartons from January through June 2010. If only Unkechauge members had consumed these cigarettes, every man, woman, and child would have smoked 364 packs per day in 2009. State Defendants present similar figures for the other Plaintiffs.[6]

The Department estimates that curbing tax evasion on reservations will generate approximately $110 million in annual tax revenue. Accordingly, New York once again seeks to collect taxes on non-member, on-reservation cigarette sales. The Department revoked its "forbearance" policy in February 2010. In June 2010, the New York Legislature amended New York Tax Law §§ 471 and 471-e, and the

---

[5] As discussed in more detail below, the Department calculates each tribe's yearly probable demand based upon population statistics for each tribe and per-capita smoking statistics released by the federal government, along with consideration of evidence of past consumption. *See* N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(e).

[6] The Seneca Nation has an estimated 7,967 members and yearly probable demand of 67,440 cartons. It purchased 10 million untaxed cartons in 2009 from state-licensed distributors. It sold approximately half of those cigarettes tax-free to out-of-state purchasers. The Mohawk Tribe has an estimated 13,784 members and yearly probable demand of 116,640 cartons. It purchased over 1 million untaxed cartons in 2009. The Oneida Nation has an estimated 1,473 members and a yearly probable demand of 12,480 cartons. It purchased 1.5 million untaxed cartons in 2009. The Department did not present these figures for the Cayuga Nation.

Department adopted regulations to implement the tax on reservation sales.[7] The Department also issued a "Technical Memorandum" explaining certain aspects of the tax scheme. *See* Amendments to the Tax Law Related to Sales of Cigarettes on Indian Reservations Beginning September 1, 2010, TSB-M-10(6)M, (8)S (July 29, 2010) [hereinafter "Technical Memorandum"]. Together, the 2010 amendments, new regulations, and Technical Memorandum (collectively "amended tax law" or "amendments") create a system to collect the excise tax on cigarette sales to non-members while exempting sales to tribal members for personal use. The amendments were scheduled to take effect September 1, 2010, but enforcement has been stayed due to the Northern District's preliminary injunction and the Western District's stays pending appeal.

**III. Amended Tax Law**

The amended tax law requires state-licensed stamping agents (*i.e.* wholesalers) to prepay the tax and affix tax stamps on all cigarette packs, including those intended for resale to tax-exempt Indians. *See* N.Y. Tax Law § 471(2);

---

[7] The Seneca Nation challenged the validity of the Department's regulations under New York's Administrative Procedure Act ("SAPA"). *See Seneca Nation of Indians v. New York*, No. 2011-000714 (N.Y. Sup. Ct. Erie Cnty.). As of this time, the Seneca Nation intends to seek an injunction against implementation of the regulations based on the Department's purported failure to comply with SAPA.

10

N.Y. Comp. Codes R. & Regs. tit. 20, §§ 74.6(a)(2),(3). To account for tribal tax immunity, the amendments distinguish between taxable and tax-free cigarettes sold to tribes or reservation retailers. The tax applies to all cigarettes sold "on an Indian reservation to non-members of the Indian nation or tribe." N.Y. Tax Law § 471(1). Thus, when purchasing inventory of taxable cigarettes, tribes or reservation retailers must prepay the tax to wholesalers. Because the tax does not apply to cigarettes sold "to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation," id. § 471(1),[8] tribes or reservation retailers may purchase a limited quantity of cigarettes without prepaying the tax to wholesalers. Wholesalers, in turn, are entitled to refunds of taxes prepaid on cigarettes eventually sold tax-free. See id. §§ 471(5)(b), 471-e(4).

To prevent non-exempt purchasers from evading the tax, the amendments limit the quantity of untaxed cigarettes wholesalers may sell to tribes or tribal retailers. This limitation mirrors each tribe's "probable demand." See id. § 471-e(2)(b); N.Y. Comp. Codes R. & Regs. tit. 20, §

---

[8] Whether taxable or tax-free, all cigarettes must bear a tax stamp. Thus, tribal members will purchase stamped, albeit tax-free, cigarettes for personal use. N.Y. Tax Law § 471(2).

11

74.6(e).  To calculate probable demand, the Department analyzes a tribe's population and per-capita smoking statistics.  *See* N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6.[9]  Additionally, tribes may submit evidence of prior consumption for the Department's consideration.  *Id*.  In this appeal, Plaintiffs do not challenge the Department's probable demand figures.

The amendments offer two mechanisms by which tribes and reservation retailers may obtain tax-free cigarettes: (1) an "Indian tax exemption coupon system" and (2) a "prior approval" system.  *See* N.Y. Tax Law § 471(1); N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(a)(4).[10]

---

[9] "The annual amount of stamped untaxed packages of cigarettes will be determined using a probable demand methodology as follows: (A) the most recent U.S. Census data available on tribal populations in New York State is obtained and then increased by ten percent for each Indian nation or tribe to allow for potential undercounting in Census enumeration and for nation or tribal use and (B) each Indian nation's or tribe's adjusted population is then multiplied by average annual per capita consumption amounts, as produced annually by the federal government, for cigarettes.  The estimated annual consumption amounts for each Indian nation or tribe are then prorated to quarterly periods for each of the four quarters . . . .  [T]hese amounts are subject to adjustment based on evidence provided by the Indian nations or tribes as to their actual consumption amounts for these periods." N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(e)(1).

[10] The amendments also provide a third option — private agreement between an individual tribe and New York State:

> If an Indian nation or tribe enters into an agreement with the state and the legislature approves such agreement or if an Indian nation or tribe enters into an agreement with the state that is part of a stipulation and order approved by a federal court of competent jurisdiction regarding the sale and distribution of

## A. Coupon System

The "recognized governing body of an Indian . . . tribe may annually elect to participate in the Indian tax exemption coupon system for that year."  N.Y. Tax Law § 471-e(1)(b).  No Plaintiff has elected the coupon system.[11]  If a tribal governing body elects the coupon system, the Department provides the tribal government a quantity of tax exemption coupons each quarter that corresponds to the tribe's probable demand.  *See id.* § 471-e(2)(a).  The tribal government may use all or part of the coupons itself or distribute them to its reservation retailers.  Although neither the statute nor the regulations require tribal governments to distribute coupons among private retailers, the State expressly "intend[s] that the Indian . . . tribes will retain the amount of Indian tax exemption coupons they

cigarettes on the nation's or tribe's qualified reservation, the terms of such agreement shall take precedence over the provisions of this article and exempt sales to non-members of the tribe or nation and non-Indians by such nation from such taxes to the extent that such taxes are specifically referred to in the agreement, and the sale or distribution, including transportation, of any cigarettes to the nation's or tribe's qualified reservation shall be in accordance with the provisions of such agreement.

N.Y. Tax Law § 471(6).  No agreements have been reached.

[11] Typically, a tribal government must elect to participate in the coupon system by August 15.  N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(b)(1).  The Department, however, may allow late election, which it has done here due to the litigation delays.  *See id.* § 74.6(b)(1)(ii).

13

need each quarter . . . , and will distribute the remaining Indian tax exemption coupons to reservation cigarette sellers on such . . . tribe's qualified reservations." *Id.* Tribes or reservation retailers then exchange the coupons with wholesalers to purchase cigarettes without paying the cost of the excise tax. *Id.* Tribal members may purchase these cigarettes tax-free. Wholesalers, in turn, submit the coupons to the Department for a refund of prepaid taxes. *Id.* § 471-e(4).

## B. Prior Approval System

Where a tribal government does not elect to participate in the coupon system, the prior approval system governs by default. *Id.* § 471(5)(a). Under this system, wholesalers must obtain the Department's approval *before* selling cigarettes tax-free to a tribal government or retailer. *Id.* § 471(5)(b). Wholesalers who sell cigarettes to a tribe or reservation retailer tax-free without the Department's prior approval violate the "terms of Article 20 of the Tax Law," N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(d)(3), and face sanctions, *see* N.Y. Tax Law § 484(5). Moreover, without prior approval and proof of a legitimate tax-free sale, wholesalers cannot recoup prepaid taxes.

Both the statute and regulations authorize the

14

Department to determine the "manner and form" by which it grants prior approval. *See* N.Y. Tax Law § 471(5)(b); N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(d)(3). The Department has provided a "general description" of the prior approval system's intended operation. *See* Technical Memorandum 5.[12] According to the Department, a website will display each tribe's quarterly tax-exempt allotment. The Department contemplates that "[u]pon receipt of a purchase request from a . . . tribe or reservation cigarette seller," a wholesaler will sign into the website, check the tribe's available allotment, and request approval to sell all or part of that allotment. *Id*. at 5–6. Once the request is submitted, "the remaining quantity available [on the website] will be reduced." *Id*. at 6. The wholesaler then has forty-eight hours from the time of prior approval to sell the tax-exempt quantity to the applicable tribe or retailer and confirm the sale with the Department. *Id.* The Department expedites refunds for confirmed tax-exempt sales. N.Y. Tax Law § 471(5)(b). If the wholesaler does not

---

[12] The Technical Memorandum contains the following statement: "A [Technical Memorandum] is an informational statement of changes to the law, regulations, or Department policies. It is accurate on the date issued. Subsequent changes in the law or regulations, judicial decisions, Tax Appeals Tribunal decisions, or changes in Department policies could affect the validity of the information presented in a [Technical Memorandum]." Technical Memorandum 8.

15

confirm the sale within forty-eight hours, then "the balance of the quantity not reported as sold will be added back to the quantity available for Indian tax-exempt sales." Technical Memorandum 6. The website may be modified by the Department in response to evidence that the prior approval system operates to prevent tribal members from receiving an adequate supply of tax-free cigarettes for personal and tribal use.

**IV. Plaintiffs' Tobacco Economies**

The Seneca Nation has licensed approximately 172 tobacco retailers and twenty-eight wholesalers. Seneca members own and operate the wholesale and retail entities. The Seneca Nation's government regulates its private tobacco economy under the tribal Import-Export Law and accompanying regulations. It assesses a $0.75 per carton tax on all cigarettes imported onto Seneca property.

The Unkechauge Nation has licensed approximately twenty-five cigarette retailers. Unkechauge members own and operate the retail entities. The Unkechauge Nation's governing Tribal Council regulates its tobacco economy "through a strict licensing regime and tribal resolutions." Unkechauge Br. 8. The Council licenses member retailers and approves which wholesalers may sell cigarettes to Unkechauge

16

retailers.  Under this regime, the "[Unkechauge] Nation purchases cigarettes from only two State licensed wholesalers, who are themselves licensed by the Tribal Council."  *Id.*  Additionally, under tribal resolutions, the Tribal Council limits the number of cartons each retailer may purchase from wholesalers, fixes the price of tobacco products, and levies a $1 per carton fee on retail sales. *Id.* at 9.

The Mohawk Tribe has licensed approximately thirty cigarette retailers.  Mohawk members own and operate the retail entities.  The Mohawk Tribe imposes a tobacco price floor and licenses tribal wholesalers and retailers.  Non-tribal entities seeking to do business with Mohawk entities must obtain a "Tribal Vendors Permit" from the Tribal Council.  The Council also assesses a "Tribal Tobacco Fee" on all tobacco products.

Unlike the Seneca Nation, Unkechauge Nation, and Mohawk Tribe, the governing bodies of the Cayuga and Oneida Nations centralize tobacco retail within their respective territories.  Cayuga and Oneida members do not own independent stores, and the tribal governments do not tax or regulate their tobacco economies.  The Cayuga Nation owns and operates two retail stores that sell cigarettes to both

17

members and non-members.  The record does not reflect the number of retail stores the Oneida Nation operates.  The Oneida Nation indicates, however, that it keeps 80,000 cigarette cartons in inventory at nearly all times for sale to non-member purchasers from Oneida-owned stores.

**V.   Procedural Posture**

This consolidated appeal arises from three separate district court proceedings: (1) Seneca Nation and Cayuga Nation in the Western District, *see Seneca Nation of Indians v. Paterson*, No. 10-CV-687A, 2010 WL 4027796 (W.D.N.Y. Oct. 14, 2010) (Arcara, *J.*); (2) Unkechauge Nation and Mohawk Tribe in the Western District, *see Unkechauge Indian Nation v. Paterson*, Nos. 10-CV-711A, 10-CV-811A, 2010 WL 4486565 (W.D.N.Y. Nov. 9, 2010) (Arcara, *J.*); and (3) Oneida Nation in the Northern District, *see Oneida Nation of N.Y. v. Paterson*, No. 6:10-CV-1071, 2010 WL 4053080 (N.D.N.Y Oct. 14, 2010) (Hurd, *J.*).

In their respective suits, all Plaintiffs moved for preliminary injunctions and raised similar arguments.  The Western District denied preliminary injunctions in both proceedings, concluding that the Seneca Nation, Cayuga Nation, Unkechauge Nation, and Mohawk Tribe each failed to demonstrate a likelihood of success on the merits.  *See*

18

*Seneca Nation*, 2010 WL 4027796, at *9; *Unkechauge Indian Nation*, 2010 WL 4486565, at *6.  However, the court granted stays in both proceedings pending this interlocutory appeal.  State Defendants appealed both stays, and the Nations and Tribe cross-appealed the denial of the injunctions.  By contrast, the Northern District granted the Oneida Nation's motion for a preliminary injunction.  *Oneida Nation*, 2010 WL 4053080, at *8–9.  State Defendants appealed.[13]

On appeal, the Oneida, Cayuga, and Unkechauge Nations argue that the precollection mechanism either imposes an impermissible direct tax on tribal retailers, or alternatively, imposes an undue and unnecessary economic burden on tribal retailers.  Additionally, all Plaintiffs argue that the amended tax law's dual allocation mechanisms — the coupon and prior approval systems — interfere with their right of self-government, unduly burden tribal retailers, and fail to adequately ensure members' access to tax-free cigarettes.  At this stage in the litigation, Plaintiffs have not demonstrated that they are likely to

---

[13] A motions panel of this Court consolidated and expedited the appeals.  It also denied State Defendants' motion to stay the Northern District's preliminary injunction and to vacate the Western District's stays pending appeal.

prevail on any of these arguments.[14]

**DISCUSSION**

## I.   Standard of Review

The fundamental question presented in these cases is whether Plaintiffs presented evidence that would justify a preliminary injunction prohibiting enforcement of the amended tax law.  We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion.  *SEC v. Dorozhko*, 574 F.3d 42, 45 (2d Cir. 2009).  An abuse of discretion occurs if the district court "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions."  *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009) (internal quotation marks omitted).  Under abuse of discretion review, the factual

[14] The Mohawk Tribe abandoned the argument raised below that the amended tax law violates Equal Protection.  Likewise, the Seneca Nation has abandoned its argument that the amended tax law is unduly burdensome because it fails to account for reservation sales to out-of-state purchasers.  The Unkechauge Nation raises five arguments not made by the other Plaintiffs: (1) the prior approval system violates the Indian Trader Statutes; (2) the precollection mechanism violates "the Takings Clause of the Fifth and Fourteenth Amendments, and the New York State Constitution;" (3) the Western District abused its discretion by denying a preliminary injunction without holding an evidentiary hearing; (4) the Western District abused its discretion in denying a motion for mediation; and (5) this Court should certify certain questions to the New York Court of Appeals.  We have considered each of these arguments and find them to be without merit.

20

findings and legal conclusions underlying the district court's decision are "evaluated under the clearly erroneous and *de novo* standards, respectively." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 103 (2d Cir. 2009) (citation and brackets omitted).

Generally, a party seeking a preliminary injunction must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (quoting *Lynch*, 589 F.3d at 98). Additionally, the moving party must show that a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, __, 129 S. Ct. 365, 374 (2008).

A party seeking to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme" cannot rely on the "fair ground for litigation" alternative even if that party seeks to vindicate a sovereign or public interest. *Monserrate,* 599 F.3d at 154 (internal quotation marks omitted). Thus, to succeed in the present appeal, Plaintiffs must establish a likelihood of

21

success on the merits.  Because we conclude that Plaintiffs have failed to satisfy this burden, there is no need to address the other prongs of the analysis.  *See id.* at 154 & n.3.

**II.  Likelihood of Success on the Merits**

    **A.   Applicable Law**

The Supreme Court has long recognized that Indian tribes possess "attributes of sovereignty over both their members and their territory."  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (internal quotation marks omitted).  The "semi-autonomous status of Indians living on tribal reservations," *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 165 (1973), vests tribes and their enrolled members with the federally protected right "to make their own laws and be ruled by them," *Williams v. Lee*, 358 U.S. 217, 220 (1959).  Among other things, tribes have authority to prescribe the conduct of their members, *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983), create economic policies, and tax economic activities within their territories, *see, e.g., Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137–39 (1982).

"The Constitution vests the Federal Government with exclusive authority over relations with Indian Tribes."

22

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) (citing U.S. Const. art. I, § 8, cl. 3).  "As a corollary of this authority, and in recognition of the sovereignty retained by Indian tribes . . . , Indian tribes and individuals generally are exempt from state taxation within their own territory."  *Id*.  Consequently, absent Congressional authorization, "[s]tates are categorically barred from placing the legal incidence of an excise tax *on a tribe or on tribal members* for sales made *inside Indian country*."  *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101-02 (2005) (internal quotation marks and citation omitted).

The situation is different, however, when a state seeks to tax non-members who engage in economic transactions on Indian reservations.  *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459 (1995).  Here, courts must subject a state tax scheme over on-reservation, non-member activities to "a particularized inquiry into the nature of the state, federal, and tribal interests at stake."  *Bracker*, 448 U.S. at 145.  Eschewing "mechanical or absolute conceptions of state or tribal sovereignty," this interests-balancing analysis instead "determine[s] whether, in the specific context, the exercise of state authority would

23

violate federal law." *Id.*

In the context of cigarette sales, the balancing of state and tribal interests is informed by two judgments that are well-established in the caselaw. First, non-Indian purchasers are consistently willing and able to evade state cigarette taxes by purchasing their cigarettes from reservation retailers. *Cf. Colville*, 447 U.S. at 145. Second, the revenue tribes and retailers gain from cigarette sales to non-members derives from the marketing of a tax exemption, not from value "generated on the reservations by activities in which the [t]ribes have a significant interest." *Id.* at 155.

In recognition of the foregoing, the Supreme Court has stated that "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, [do not] authorize Indian tribes . . . to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id.* at 155. That is so because "[s]tates have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop

24

elsewhere." *Milhelm Attea*, 512 U.S. at 73. A state's interest in ensuring the collection of taxes on cigarette sales to non-Indians continues to outweigh a tribe's countervailing interests even when collection of an excise tax "seriously disadvantages or eliminates the Indian retailer's [cigarette] business with non-Indians." *Colville*, 447 U.S. at 151.

Furthermore, tribes do not oust a state's taxing authority merely by collecting tribal taxes on reservation cigarette sales and regulating their cigarette economies. *See id*. at 158-59. A state "does not interfere with the [t]ribes' power to regulate tribal enterprises" simply by imposing its tax on sales to non-members. *Id.* at 159. In fact, the balance of interests favors state taxation of cigarette sales to non-members even where collection of the state tax deprives tribes of their own tax revenues. *Id.* at 156.

In light of this balance of interests, the Supreme Court has determined that to enforce valid state taxation of on-reservation cigarette sales, states may impose "on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians." *Milhelm Attea*, 512 U.S. at 73. As a result, a party challenging a

25

state cigarette tax must establish that a state's collection mechanism is unduly burdensome and not reasonably tailored to collection of the taxes. *See Colville*, 447 U.S. at 160. On several occasions, the Supreme Court has found collection mechanisms similar to those at issue in this appeal to be consistent with principles of federal Indian law.

**1. Law Regarding Precollection of the Tax**

In *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, the Court upheld a Montana tax law that required the cigarette seller to prepay the tax and add the tax to the cigarette's retail price. 425 U.S. 463, 483 (1976); *see also Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 392 F. Supp. 1297, 1308 (D. Mont. 1974) (describing the tax "as an advance payment [which] shall be added to the price of the cigarettes and recovered from the ultimate consumer or user.") (internal quotation marks omitted). There, like here, the tribe argued that precollection of the tax infringed tribal sovereignty because the tribal retailer "has been taxed, and . . . has suffered a measurable out-of-pocket loss." *Moe*, 425 U.S. at 481. The Court rejected this argument because the legal incidence of the tax fell upon non-member purchasers. *Id.* at 481–82. The Court reasoned that

26

prepayment was "not, strictly speaking, a tax at all," but rather constituted the "simpl[e]" requirement that "the Indian proprietor . . . add the tax to the sales price and thereby aid the State's collection" effort. *Id*. at 483. Consequently, the Court held that Montana's "requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." *Id*.

Similarly, in *Colville,* the Court upheld a Washington precollection scheme that required retailers to either purchase prestamped cigarettes from wholesalers or purchase tax stamps directly from the state and affix them to cigarette packs before sale. *Colville*, 447 U.S. at 141–42; *see also Confederated Tribes of Colville Indian Reservation v. Washington*, 446 F. Supp. 1339, 1346 (E.D. Wash. 1978) (describing the precollection mechanism). As in *Moe,* the Court characterized precollection as a "simple collection burden imposed . . . on tribal smokeshops" and held that Washington "may validly require the tribal smokeshops to affix tax stamps purchased from the State to individual packages of cigarettes prior to the time of sale to

27

nonmembers of the Tribe." *Colville*, 447 U.S. at 159.[15]

**2.   Law Regarding Allocation of Tax-Free Cigarettes**

In *Milhelm Attea*, the Supreme Court analyzed the 1988 version of New York's tax law. *Milhelm Attea*, 512 U.S. at 78. As the Western District correctly noted, the general features of the 1988 version – precollection, probable demand limitations, allocation through the use of coupons and prior approval – were similar to the main features of the amended tax law. *See Seneca Nation*, 2010 WL 4027796, at *9-10 & *14 (comparing the amended tax law and 1988 version). In *Milhelm Attea*, wholesalers that were federally licensed to sell cigarettes to reservation Indians challenged the 1988 regulations as being preempted by the Indian Trader Statutes. Under the Indian Trader Statutes, the Commissioner of Indian Affairs has sole authority to "make such rules and regulations . . . specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261. The wholesalers argued that the federal government's authority to regulate Indian Traders precluded New York from both

---

[15] Though less relevant to the present case, *Colville* also upheld Washington's requirement that tribal retailers keep extensive records concerning both taxable and nontaxable transactions. *Colville*, 447 U.S. at 159-60.

28

limiting the quantity of tax-free cigarettes wholesalers could sell to reservation retailers and requiring wholesalers to obtain approval before making tax-free sales. The Court disagreed.

Relying on *Moe* and *Colville*, the Court recognized New York's valid interest "in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations," and concluded that the "balance of state, federal, and tribal interests" left appreciable room for state regulation of on-reservation cigarettes sales to non-member purchasers. *Milhelm Attea*, 512 U.S. at 73. Congress enacted the Indian Trader Statutes to protect reservation Indians who do business with non-Indians. Thus, the Court reasoned, it would be "anomalous" to forbid states from imposing on non-Indian wholesalers the same tax collection and bookkeeping burdens that, under *Moe* and *Colville*, states could validly impose on reservation retailers. *Id*. at 74. "Just as tribal sovereignty does not completely preclude States from enlisting tribal retailers to assist enforcement of valid state taxes, the Indian Trader Statutes do not bar the States from imposing reasonable regulatory burdens upon Indian traders for the same purpose." *Id*.

The Court also rejected the argument that the tax-free allotments and prior approval requirement imposed excessive regulatory burdens on wholesalers or Indian trading. Specifically, the Court held that the probable demand mechanism validly related to "New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream" and constituted a "reasonably necessary method of preventing fraudulent transactions, . . . without unnecessarily intruding on core tribal interests." *Id*. at 75 (internal quotation marks omitted). The Court observed that "[i]f the Department's 'probable demand' calculations are adequate, tax-immune Indians will not have to pay New York cigarette taxes . . . ." *Id*. Finally, it held that "[t]he associated requirement that the Department preapprove deliveries of tax-exempt cigarettes in order to ensure compliance with the quotas does not render the scheme facially invalid." *Id*. at 76.

Importantly, in analyzing the 1988 regulations, the Court construed the wholesalers' preemption challenge as "essentially a facial one." *Id.* at 69. Accordingly, the Court declined to "rest [its] decision on consequences that, while possible, are by no means predictable," and limited its analysis "to those alleged defects that inhere in the

30

regulations as written." *Id.* Regarding the probable demand mechanism, for example, the Court noted that "[w]hile the possibility of an inadequate quota may provide the basis for a future challenge to the *application* of the regulations, [it was] unwilling to assume in the absence of any such showing by respondents, that New York will underestimate the legitimate demand for tax-free cigarettes." *Id.* at 75-76. The prior approval requirement, the Court observed, "should not prove unduly burdensome absent wrongful withholding or delay of approval — problems that can be addressed if and when they arise." *Id.* at 76. The Court added that "[a]greements between the Department and individual tribes might avoid or resolve problems that are now purely hypothetical." *Id.* at 77.

**B.   Analysis**

In the present case, Plaintiffs challenge the amended tax law's precollection requirement as well as the amended tax law's dual mechanisms for allocating each tribe's limited quantity of tax-free cigarettes.

**1.   Precollection of the Tax**

Under the amended tax law's precollection scheme, the wholesale price of taxable cigarettes includes the cost of the tax.  Tribal retailers, like other New York retailers,

pay the tax to wholesalers when purchasing inventory and recoup the tax by adding it to the retail price. The Oneida and Cayuga Nations argue that this prepayment obligation is, in effect, a categorically impermissible direct tax on tribal retailers. We disagree.

As we have already explained, it is only the *legal* burden of a tax — as opposed to its practical economic burden — that a state is categorically barred by federal law from imposing on tribes or tribal members. *See Chickasaw Nation*, 515 U.S. at 460 (rejecting "economic reality" as an unworkable measure of the scope of state taxation authority). Focusing on the economic impact of precollection, the Northern District concluded that the amended tax law "in effect [impermissibly] requires the Oneida Nation to pay the tax." *Oneida Nation*, 2010 WL 4053080, at *8. This finding is not relevant, however, because the express language of New York's tax law places the legal incidence on the consumer, not the wholesaler or retailer. N.Y. Tax Law § 471(2) ("It is intended that the ultimate incidence of and liability for the tax shall be upon the consumer."). In fact, the statute contains mandatory "pass-through provisions" that require wholesalers and retailers to pass on the tax to the consumer. *Id.*

32

("[A]ny agent or dealer who shall pay the tax to the commissioner shall collect the tax from the purchaser or consumer."); *id*. § 471(3) ("The amount of taxes advanced and paid by the agent . . . shall be added to and collected as part of the sales price of the cigarettes.").  The Supreme Court has "suggested that such 'dispositive language' from the state legislature is determinative of who bears the legal incidence of a state excise tax."  *Wagnon*, 546 U.S. at 102 (citing *Chickasaw Nation*, 515 U.S. at 461).[16]  The statement of legislative intent and the mandatory pass-through provisions establish that the legal incidence of New York's tax falls on non-Indian consumers.  Accordingly, whatever its economic impact, the tax is not categorically barred.

The Oneida, Cayuga, and Unkechauge Nations argue that precollection, if not categorically barred, nonetheless places an undue and unnecessary economic burden on tribal retailers.  For example, the Oneida Nation estimates that upon implementation of the precollection mechanism, it will

_____

[16] "In the absence of such dispositive language, the [legal incidence] question is one of 'fair interpretation of the taxing statute as written and applied.'"  *Chickasaw Nation*, 515 U.S. at 461 (quoting *Cal. Bd. of Equalization v. Chemehuevi Tribe*, 474 U.S. 9, 11 (1985) (per curiam)).  Here, the "fair interpretation" analysis is unnecessary.

33

need to front an additional $3.5 million per year to prepay the tax and spend over $200,000 per year to finance that increased cost in order to maintain its current cigarette inventory levels (approximately 80,000 cartons per year at all times).  The Northern District concluded that these financing costs imposed an impermissible burden on tribal sovereignty.  We disagree for two reasons.

First, the precollection mechanism will undoubtedly impose an increased economic cost on tribal retailers who continue to market taxable cigarettes to non-member purchasers.  But those costs result from the retailer's decision to participate in the taxable cigarette market, a market in which Plaintiffs and their members have "no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all."  *Colville*, 447 U.S. at 151 n.27.

Second, New York's precollection scheme is materially indistinguishable from those upheld in *Moe* and *Colville*. Here, State Defendants have presented evidence of non-member tax evasion occurring through on-reservation cigarette purchases.  Thus, as in *Moe* and *Colville*, the amended tax law's precollection mechanism constitutes a minimal tax collection burden that is "reasonably necessary" to prevent

34

"wholesale evasion of [New York's] own valid taxes without unnecessarily intruding on core tribal interests." *Milhelm Attea*, 512 U.S. at 75 (brackets in original) (quoting *Colville*, 447 U.S. at 160, 162).

The Cayuga, Oneida, and Unkechauge Nations seek to distinguish *Moe* and *Colville* by pointing out that when those cases were decided Washington imposed a $1.60 per carton tax, *see Colville*, 447 U.S. at 141, and Montana a $1.20 per carton tax, *see Moe*, 392 F. Supp. at 1313, whereas New York currently imposes a $43.50 per carton tax. The three Nations argue, and the Northern District agreed, that the significantly greater economic burden imposed by New York's tax distinguishes the precollection schemes upheld in *Moe* and *Colville*, and renders New York's unduly burdensome. Contrary to the Nations' arguments, it was the demonstrated need to prevent tax evasion by non-Indian purchasers, not the low cost of the state tax, that justified precollection in *Moe* and *Colville*. That justification remains valid even where the excise tax is high; the higher the tax rate, the greater the economic incentive to avoid it.

The Nations also contend that precollection is not "reasonably tailored" to New York's tax collection interest

35

because there are other less burdensome alternatives.  The Northern District agreed with the Oneida Nation's argument that precollection is unnecessary to enforce payment of the cigarette tax because New York Tax Law § 471-a already requires each individual cigarette purchaser to remit the tax to the State within twenty-four hours of when liability for the tax accrued.  *See Oneida Nation*, 2010 WL 4053080, at *9 (citing N.Y. Tax Law § 471-a).  However, the New York legislature has reasonably determined that collection of the cigarette excise tax through efforts directed at individual buyers is impractical, and that, if it is to be collected at all, the tax must be precollected when cigarettes enter the stream of commerce.  The Oneida Nation, for example, purchased 1.5 million untaxed cartons of cigarettes in 2009, despite having only 1,473 members.  The legislature was entitled to conclude on the basis of this and other evidence that collection of the tax through efforts directed at individual purchasers is ineffective and unworkable.  *Cf. Milhelm Attea*, 512 U.S. at 75 (upholding "New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream as a reasonably necessary method of preventing fraudulent transactions.") (internal

quotation marks omitted).[17]

Therefore, the Oneida, Cayuga, and Unkechauge Nations have failed to demonstrate a likelihood of success on the merits of their arguments against precollection of the tax.

**2.  Allocation of Tax-Free Cigarettes**

Plaintiffs argue that the amended tax law's dual allocation mechanisms — the coupon and prior approval systems — fail to adequately ensure members' access to tax-free cigarettes, unduly burden tribal retailers, and threaten tribal self-government.

**a.  Applicability of *Milhelm Attea***

Initially, we reiterate that the main features of the amended tax law's probable demand and allocation mechanisms are substantially similar to those of the 1988 version upheld against a preemption challenge in *Milhelm Attea*. Like the 1988 version, the amended tax law limits the tax-free cigarettes that wholesalers may sell according to each

---

[17] The three Nations cite other examples of plausibly less burdensome collection mechanisms.  For example, they contend that tribal retailers could obtain sufficient cash flow to meet future prior approval payments if the State waived precollection for the first year.  Whatever the practical merit of their suggestions, states are not required to adopt the least burdensome collection mechanism imaginable.  Provided the State's mechanism is *reasonably* tailored to its collection effort — and here the Nations have not demonstrated the contrary — the State's chosen mechanism does not infringe tribal sovereignty merely because there are conceivably less burdensome alternatives.

37

tribe's probable demand.  New York's legitimate interest in avoiding tax evasion by non-Indian consumers justifies these probable demand limitations.  *See Milhelm Attea*, 512 U.S. at 75.  Further, like in the 1988 version, through the alternative coupon and prior approval systems, the State meets its obligation to make available to tribal members a tax-free quantity of cigarettes sufficient to "satisfy the legitimate demands of those reservation Indians who smoke[.]"  *Id.* at 69.  Thus, under the reasoning of *Milhelm Attea*, the main features of the amended tax law's quota and allocation mechanisms, as written, do not unduly burden tribal retailers or infringe tribal self-government.

In an effort to distinguish *Milhelm Attea*, Plaintiffs argue that its rationale applies only to preemption challenges, whereas the present dispute concerns tribal sovereignty.  They note that *Milhelm Attea* expressly declined to "assess for all purposes each feature of New York's tax enforcement scheme that might affect tribal self-government or federal authority over Indian affairs."  *Id*. at 69.

Contrary to Plaintiffs' argument, *Milhelm Attea*'s reasoning is applicable here because federal preemption over

38

the regulation of Indian tribes is closely related to federal recognition and protection of tribal sovereignty. Preemption and tribal sovereignty are two "independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Bracker*, 448 U.S. at 142. "[P]rinciples of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise," *Colville*, 447 U.S. at 155, ultimately measure the scope of a state's regulatory authority through "a particularized inquiry into the nature of the state, federal, and tribal interests at stake," *Bracker*, 448 U.S. at 145.

Indeed, *Milhelm Attea*'s reasoning demonstrates the relationship between the preemption and tribal sovereignty analyses within federal Indian law. The Court stated that "[a]lthough *Moe* and *Colville* dealt most directly with claims of interference with tribal sovereignty, the reasoning of those decisions requires rejection of the submission that 25 U.S.C. § 261 bars any and all state-imposed burdens on Indian traders." *Milhelm Attea*, 512 U.S. at 74. Accordingly, *Milhelm Attea's* analysis is relevant to the issues in this appeal, and to the extent the general

features of the amended tax law's quota and allocation schemes mirror those in the 1988 version, *Milhelm Attea* undermines the likelihood of Plaintiffs' success on this pre-enforcement challenge to the amended tax law's validity.

**b.    Coupon System**

The Cayuga Nation, Seneca Nation, Unkechauge Nation, and Mohawk Tribe argue that the coupon system interferes with their tribal self-rule because it would require tribal governments to either retain coupons for distribution by the government or allocate coupons among reservation retailers.[18]  We agree with the Western District that the coupon system does not impose allocation burdens on the Cayuga Nation because its government owns and operates the Nation's two cigarette retailers.  The Nation may elect the coupon system, use the coupons to purchase tax-free inventory, and sell that inventory to members from its

---

[18] *Milhelm Attea* does not specifically bear on our analysis of the amended tax law's coupon system because the present coupon system functions differently than it did in the 1988 version.  Under the 1988 version, the tax-exempt coupons and prior approval requirement were not alternative systems, but rather, functioned together.  The Department would approve every tax-exempt sale *and* distribute coupons directly to reservation retailers, "entitling them to their monthly allotment of tax-exempt cigarettes."  *Milhelm Attea*, 512 U.S. at 66.  Under the amended tax law, by contrast, the coupon system and prior approval system operate independently.  Moreover, if a tribe elects the coupon system, the Department distributes tax-exempt coupons to tribal governments, not reservation retailers.

stores.  Therefore, the Cayuga Nation is unlikely to prevail on the merits of its argument that the coupon system infringes its right of self-government.

The Seneca Nation, Unkechauge Nation, and Mohawk Tribe, which have regulated, market-based tobacco economies, argue that under the coupon system, tribal governments must distribute a limited number of coupons among their member-owned and -operated reservation retailers.  They argue that creation of a tribal allocation system would involve political decisions and require the enactment and enforcement of new tribal regulations.  They contend that because the coupon system would require these governmental actions, it interferes with their right of self-rule.  Because the coupon system is optional, we disagree.

Consistent with the right to "make their own laws and be ruled by them," *Williams*, 358 U.S. at 220, the Seneca, Unkechauge, and Mohawk governments are free to decide whether involvement in the allocation of their respective cigarette allotments is in the members' best interests.  If a tribal government chooses the coupon system, then it likewise accepts the correlated responsibility to design an effective allocation system, if necessary.  New York has not

41

foisted that requirement upon the tribal government.

### c. Prior Approval System

As written, the prior approval system imposes no regulatory burdens on Plaintiffs or their retailers. It operates entirely off-reservation and involves only wholesalers and the Department. If prior approval does not unduly burden federally licensed Indian traders by requiring them to obtain the Department's approval before making tax-free sales, *see Milhelm Attea*, 512 U.S. at 75–76, this same mechanism certainly does not burden tribes or tribal retailers that play no role in the prior approval system whatsoever, *see United States v. Baker*, 63 F.3d 1478, 1489 (9th Cir. 1995) (holding that Washington's prior approval scheme did not impermissibly burden tribal sovereignty because the "entire regulatory program [was] accomplished off-reservation").

Plaintiffs vigorously argue, however, that the prior approval system *might* have the effect of denying tribal members access to tax-free cigarettes and disrupting the current functioning of Plaintiffs' tobacco economies. Specifically, Plaintiffs point out that under the 1988 regulations, prior approval was "based upon evidence of

42

valid purchase orders received" by the wholesaler and presented to the Department. *See Milhelm Attea*, 512 U.S. at 66 (quoting N.Y. Comp. Codes R. & Regs. tit. 20, §§ 336.7(d)(1), (d)(2)(ii) (1992) (repealed)). The amended tax law does not contain this purchase order requirement.

Plaintiffs contend that without this requirement, any state-licensed wholesaler might preemptively lock up a tribe's entire quarterly allotment. Although approval automatically expires after forty-eight hours without confirmation of the sale, Plaintiffs predict that the same wholesaler might immediately re-request prior approval and do so indefinitely. Thus, a wholesaler could leverage this forty-eight hour long monopoly position to charge premium prices, force tribal retailers to purchase exclusively from that wholesaler, or sell exclusively to favored tribal retailers. Plaintiffs contend that a market-dominant wholesaler could ultimately deprive tribal members of access to tax-free cigarettes and disrupt their tobacco economies. In response, tribal governments would either have to enact new tribal laws to police against monopolistic wholesalers or elect the coupon system. Plaintiffs view both situations as interfering with their rights of self-government.

To support its view, the Seneca Nation submitted an affidavit from Peter Day, a state-licensed wholesaler and federally-licensed Indian Trader.[19]  Day stated that upon implementation of the tax law he "intends to purchase the entire tax-exempt allocation for each qualified Indian reservation unless it has already been acquired by another agent and that quantity will be made available only to my customers."  He further stated that given the limited quantity and high demand for tax-exempt cigarettes, "tribal members can expect to pay higher prices" for those cigarettes.

The tax law does not explicitly prohibit a single wholesaler from obtaining approval over a tribe's entire allotment, and the regulations do not explicitly prohibit a wholesaler from selling that entire allotment to only one retailer.  The Western District concluded that "there is a

---

[19] Prior to enactment of the amended tax law, Peter Day, along with an individual member of the Seneca Nation, sought to enjoin the State from collecting cigarette taxes on Indian reservations under the tax law regime currently in effect at that time.  *See Day Wholesale, Inc. v. New York*, No. 2006/7668 (N.Y. Sup. Ct. Erie Cnty.).  Erie County Supreme Court granted two preliminary injunctions, the first of which was affirmed by the Appellate Division.  *See Day Wholesale, Inc. v. New York*, 51 A.D.3d 383 (4th Dep't 2008).  Following enactment of the amended tax law, the State successfully moved to vacate the two *Day Wholesale* preliminary injunctions.  *See Day Wholesale, Inc.*, No. 2006/7668 (N.Y. Sup. Ct. Erie Cnty., Aug. 31, 2010).  On August 31, 2010, plaintiffs, joined by intervenor Seneca Nation, appealed to the Appellate Division, Fourth Department.  That appeal remains pending.

very realistic possibility that the scenario presaged by Day will occur." *Seneca Nation*, 2010 WL 4027796, at *16. Though without the benefit of Day's affidavit, the Northern District likewise concluded that the prior approval system is "ripe for manipulation by wholesalers, and actually incentivizes wholesalers" to monopolize the Oneida Nation's quota. *Oneida Nation*, 2010 WL 4053080, at *9.

Plaintiffs, particularly the Seneca Nation, argue that they have demonstrated significant implementation problems that will plague the prior approval system. They claim that because the problems are specific to each tribe's distinct tobacco economy, they have established that they are likely to prevail on the "as-applied" challenges that the Court in *Milhelm Attea* left for "some future proceeding." *Milhelm Attea*, 512 U.S. at 77. Again we disagree.

Even if we accept, which we do not, that Plaintiffs have properly classified their challenges as "as-applied,"[20]

---

[20] Plaintiffs and State Defendants hotly dispute whether the present challenge is properly classified as facial or as-applied. This classification, they assume, determines whether we consider Plaintiffs' hypothetical scenarios. Though the Constitution vests the federal government with the exclusive power to regulate Indian tribes (and therefore direct state taxation of Indian tribes, absent Congressional approval, is constitutionally barred), tribal sovereignty challenges are not, strictly speaking, constitutional challenges. *Cf. Colville,* 447 U.S. at 167–68 (Brennan, *J.,* concurring in part and dissenting in part). Thus, the familiar facial/as-applied distinction only relates to this case by rough analogy. Regardless of

nothing requires us to assume that a monopoly in tax-free cigarettes will occur and to evaluate the prior approval system under that assumption. Like the wholesalers in *Milhelm Attea*, Plaintiffs seek to enjoin the amended tax law before it is implemented; like the Court in *Milhelm Attea*, we decline to base our decision on "consequences that, while possible, are by no means predictable." *Id.* at 69.

The Department anticipates that "[u]pon receipt of a purchase request from a [tribe or reservation retailer]" a wholesaler will request approval from the Department to sell that quantity of cigarettes. Technical Memorandum 5. Under the Department's "general understanding" of the prior approval system, wholesalers will only seek prior approval if the wholesaler has a legitimate tribal buyer. Plaintiffs contend that the prior approval system will not function as the Department intends.[21] For at least two reasons, on this

how the challenge is classified, the fact remains that no version of New York's collection scheme has ever been implemented. Lacking evidence of its actual operation, Plaintiffs argue that the amended tax law fails to foreclose one scenario that *might* arise upon implementation. But under the statute, regulations, and the Technical Memorandum, that scenario is by no means certain to occur. The system's actual operation remains largely uncertain. At this pre-enforcement stage, and on this record, such speculation cannot support a preliminary injunction of a state taxation scheme that is valid as written.

[21] As the Technical Memorandum indicates, the Department intends that wholesalers will only seek prior approval after obtaining a purchase order. The Technical Memorandum is an informational

record we cannot say which understanding will prove correct.

First, Plaintiffs' predictions ignore the broader legal framework within which wholesalers and tribal retailers operate. That legal framework discourages wholesalers from abusing the prior approval system. To sell cigarettes to tribes or their retailers, a wholesaler must be a state-licensed distributor, *see* N.Y. Tax Law § 480, and a federally-licensed Indian Trader, *see* 25 U.S.C. § 262. Under New York law, the Tax Commissioner may cancel or suspend a wholesaler's state license for, among other things, "commit[ing] fraud or deceit in his . . . operations as a wholesale dealer." N.Y. Tax Law § 480(3)(b)(i); *see also* N.Y. Comp. Codes R. & Regs. tit. 20, §§ 71.6(b)(2), 72.3(b)(2). Under federal law, the Superintendent of the Bureau of Indian Affairs must "see that the prices charged by licensed [Indian] traders are fair and reasonable." 25 C.F.R. § 140.22. Wholesalers, like Peter Day, who intend to abuse the prior approval system risk losing their New York and federal licenses. A rational wholesaler must weigh the

statement that provides the Department's "general understanding" of the prior approval system. Notwithstanding the Department's intent, two State witnesses admitted that the monopoly scenario is possible under the prior approval system. These concessions do not render the system invalid. They merely confirm that both fair dealing and opportunism are possible under the prior approval system. The system's actual operation, however, is speculative.

potential short-term financial benefits of gaming the prior approval system against the potential long-term financial loss caused by the suspension or revocation of necessary licenses.[22]

Second, if wholesalers disregard the legal risks of monopolistic behavior, the Department has the flexibility to modify the prior approval system to deter such behavior. The Department enjoys discretion to set and amend the conditions for prior approval. N.Y. Tax Law § 471(5)(b) ("The department shall grant agents and wholesalers prior approval in a manner and form to be determined by the department and as *may* be prescribed by regulation.") (emphasis added); N.Y. Comp. Codes R. & Regs. tit. 20, § 74.6(d)(3) ("The manner and form of prior approval will be determined by the department, and may include the use of an interactive Web application."). Thus, modification of the prior approval system's mechanics does not require amending the statute or promulgating new regulations. Presently,

---

[22] The Seneca Nation, Unkechauge Nation, and Mohawk Tribe argue that some of their own reservation retailers might collude with wholesalers to obtain monopoly positions within their reservations. Tribal sovereignty, however, vests tribes with the power to regulate the conduct of their own members, *see Mescalero Apache Tribe*, 462 U.S. at 332, and all three Plaintiffs in fact heavily regulate their retailers. Indeed, the Unkechauge Nation already restricts the quantity of cigarettes its reservation retailers may purchase from wholesalers. *See* Unkechauge Br. 8.

however, the record of the Department's effectiveness in adapting the prior approval system is nonexistent because, as a result of the injunctions or stays that were granted, wholesalers have not been required to use the prior approval system.

Moreover, any of the Plaintiffs may foreclose the uncertainty associated with the prior approval system by entering formal agreements with the Department.  As the Supreme Court observed in *Milhelm Attea*, "[a]greements between the Department and individual tribes might avoid or resolve problems that are now purely hypothetical."  *Milhelm Attea*, 512 U.S. at 77.  Upon approval from the New York Legislature or a federal court, the collection and allocation mechanism contained in the agreement would supersede the statutory allocation mechanisms and eliminate the uncertainty of private behavior.  *See* N.Y. Tax Law § 471(6).

At this pre-enforcement stage, Plaintiffs have not demonstrated that they are likely to prevail on their claim that the amended tax law infringes tribal sovereignty or unduly burdens tribal retailers.  Plaintiffs ultimately request that the tax law be enjoined prior to its

implementation on the basis of hypothetical private behavior and the assumption that there will be no Department response. This kind of speculation cannot support a pre-enforcement injunction of a state taxation scheme that is valid as written.[23]

Finally, the Seneca Nation, Unkechauge Nation, and Mohawk Tribe argue that flaws in the prior approval system will disrupt the current state of their tobacco economies. Specifically, they argue that certain tribal retailers might be unable to obtain a sufficient quantity of tax-exempt cigarettes and their businesses will suffer. The three Plaintiffs argue that this anticipated disruption will undermine the federal interest in promoting and protecting tribal economic self-sufficiency and burden tribal members' ability to engage in tax-free commerce with one another.

Previously, all cigarettes sold to tribes and reservation retailers were untaxed. Reservation retailers sold approximately ninety-nine percent of those untaxed cigarettes to non-members. But there was no practical distinction between a reservation retailer's member and non-

---

[23] Because we reject Plaintiffs' contentions that they are entitled to a preliminary injunction enjoining the prior approval system, we do not address the severability argument of the Unkechauge Nation and Mohawk Tribe.

member cigarette markets.  Plaintiffs' current tobacco economies developed under this system.  For example, the mass quantity of available untaxed cigarettes allowed members of the Seneca Nation to open over 170 tobacco stores.  Members could access tax-free cigarettes at any of these stores.

New York's decision to limit the quantity of tax-free cigarettes sold to reservation retailers will undoubtedly disrupt the status quo, regardless of how the Department allocates the untaxed cigarettes.  Yet in limiting the availability of tax-free cigarettes, the State does not have to ensure that each reservation retailer obtains its pre-amendment supply.  Nor must the State ensure that tribal members continue to enjoy the same easy access to tax-free cigarettes.  The Northern District erred in concluding at this pre-enforcement stage that the prior approval system "burdens [the Oneida Nation] by not protecting the right to have available tax-free cigarettes for members and itself, as required by law."  *Oneida Nation*, 2010 WL 4053080, at *9. As written, the prior approval system makes tax-free cigarettes available to member purchasers.  Actual problems of implementation "can be addressed if and when they arise."

*Milhelm Attea*, 512 U.S. at 76.[24]

**CONCLUSION**

Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims that (1) the precollection scheme impermissibly imposes a direct tax on tribal retailers, or alternatively, imposes an undue and unnecessary economic burden on tribal retailers; and (2) the coupon and prior approval systems interfere with their rights of self-government and rights to purchase cigarettes free from state taxation. The Northern District committed legal error in determining that both of these arguments were likely to succeed, and thus abused its discretion in granting the Oneida Nation's motion for preliminary injunction. The Western District correctly rejected these arguments and properly denied the Seneca Nation's, Cayuga Nation's, Unkechauge Nation's, and Mohawk Tribe's motions for preliminary injunctions.

The Western District's two orders of October 14, 2010 and November 9, 2010 are **AFFIRMED**. The Northern District's order of October 14, 2010 is **VACATED**. All stays pending

---

[24] Unlike the Western District, we express no opinion on whether the monopoly scenario, if it occurred, would constitute state infringement of tribal sovereignty. *See Seneca Nation*, 2010 WL 4027796, at *16–17.

52

appeal are **VACATED**.  The cases are **REMANDED** for further proceedings consistent with this opinion.